# In the
# United States Court of Appeals
## For the Seventh Circuit
———————

No. 03-2147

VERN STEINMAN, FLOYD SINCLAIR, and
RON EICKELSCHULTE, on behalf of themselves
and those similarly situated,

*Plaintiffs-Appellants*,

*v.*

TERESA HICKS, *et al.*,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 00-CV-3260—**Richard Mills**, *Judge*.

———————

ARGUED OCTOBER 28, 2003—DECIDED DECEMBER 12, 2003

———————

Before BAUER, POSNER, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. Participants in the MMC Employees Profit Sharing Plan brought this suit under section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), against the plan's trustees, charging a breach of fiduciary obligation—specifically, an imprudent failure to diversify the plan's assets. The district judge granted summary judgment for the defendants. 252 F. Supp. 2d 746 (C.D. Ill. 2003). There was some confusion in the district court over whether the suit was under section 502(a)(3) or 502(a)(2), but it is clearly

the latter, because the plaintiffs are asking that the trustees be ordered to make good the losses to the plan caused by their having breached fiduciary obligations. That is relief expressly authorized by section 409(a), 29 U.S.C. § 1109(a); and section 502(a)(2) is by its terms the vehicle for enforcing that section, while section 502(a)(3) is the vehicle for suits by individuals who are seeking relief just on their own behalf rather than on behalf of the plan. On the differences between the two subsections, see *Piazza v. Ebsco Industries, Inc.*, 273 F.3d 1341, 1353 n. 7 (11th Cir. 2001); *Strom v. Goldman, Sachs & Co.*, 202 F.3d 138, 149 (2d Cir. 1999); *Wald v. Southwestern Bell Corp. Customcare Medical Plan*, 83 F.3d 1002, 1006 (8th Cir. 1996).

The pension plan, created for employees of Moorman Manufacturing Company, was an ESOP—an employee stock ownership plan, a type of pension plan intended to encourage employers to make their employees stockholders. 29 U.S.C. § 1107(d)(6)(a); Tax Reform Act of 1976, Pub. L. No. 94-455, § 803(h), 90 Stat. 1590; *Kuper v. Iovenko*, 66 F.3d 1447, 1458 (6th Cir. 1995); *Moench v. Robertson*, 62 F.3d 553, 568-69 (3d Cir. 1995); *Martin v. Feilen*, 965 F.2d 660, 664 (8th Cir. 1992). In the typical such plan, the employer contributes the stock "without charge" to a retirement plan for the employees. *United States v. McCord*, 33 F.3d 1434, 1440 n. 5 (5th Cir. 1994). (We use scare quotes in recognition of the fact that there are no free lunches; any benefit that an employer confers on an employee is reckoned by the employer as a cost and so affects the overall level of compensation that he is willing to pay.)

Congress, believing employees' ownership of their employer's stock a worthy goal, has encouraged the creation of ESOPs both by giving tax breaks and by waiving the duty ordinarily imposed on trustees by modern trust law (including ERISA, 29 U.S.C. § 1104(a)(1)(C); *Etter v. J. Pease Con-*

*struction Co.*, 963 F.2d 1005, 1010 (7th Cir. 1992); *Matassarin v. Lynch*, 174 F.3d 549, 567 (5th Cir. 1999); *Moench v. Robertson, supra*, 62 F.3d at 568) to diversify the assets of a pension plan. 29 U.S.C. §§ 1104(a)(2), 1107(a), (b)(1); *Brown v. American Life Holdings, Inc.*, 190 F.3d 856, 860 (8th Cir. 1999); *Kuper v. Iovenko, supra*, 66 F.3d at 1458; *Moench v. Robertson, supra*, 62 F.3d at 568. Since the very purpose of an ESOP is to give employees stock in the employer, it would be anomalous if the ESOP's trustees were required to sell most of the stock donated by the employer in order to create a diversified portfolio of stocks. Retention would be perilous if ESOPs were intended to replace traditional pension arrangements, but they are not; they are intended to promote the ownership, partial or complete, of firms by their employees. Susan J. Stabile, "Pension Plan Investments in Employer Securities: More Is Not Always Better," 15 *Yale J. Reg.* 61, 69 (1998); William R. Levin, "The False Promise of Worker Capitalism: Congress and the Leveraged Employee Stock Ownership Plan," 95 *Yale L.J.* 148, 150, 158-59 (1985). We shall see later that Moorman's ESOP was not the only pension plan for its employees. (As a detail, we point out that an ESOP, when it takes the form of a retirement plan, does not *really* create a workers' co-op, because the plan participants include retired as well as current employees, and their interests are not identical.) Given the nature and purpose of an ESOP, it is no surprise that 65 percent of the assets of the MMC Employees Profit Sharing Plan consisted of common stock in Moorman Manufacturing Company, with the other 35 percent being invested in mutual-fund shares.

In 1997, Archer Daniels Midland acquired Moorman by an exchange of ADM common stock for the common stock of Moorman. As a result, 65 percent of the assets of the MMC plan now consisted of ADM stock. ADM replaced Moorman as the plan's sponsor and appointed new trustees, while

Moorman's employees were offered employment by ADM. In its role as plan sponsor, ADM decided to terminate the plan and allow the participants to join ADM's pension plans; ADM has its own ESOP, plus (it appears—the record is somewhat unclear, but we do not understand the plaintiffs to be contesting the point) a conventional defined-benefit retirement plan. At termination the assets of the Moorman plan originally were to be distributed to the participants in cash. But upon acquiring Moorman ADM amended the plan to authorize each participant to choose whether to take the distribution in the form of cash, or ADM stock, or to roll it over into ADM's ESOP or into an IRA.

The distribution could not occur, however, until the plan was terminated. As is customary, ADM made termination contingent on receiving a favorable tax ruling from the IRS. It took 18 months to get the ruling, longer than usual but only because the IRS conducted a random audit of the plan. During the 18-month period the price of ADM stock fell by almost a third. The plaintiffs argue that the plan's trustees, knowing the plan would not be terminated until the IRS issued its ruling, which was likely to take at least a year and maybe (as happened) more, should at the outset have sold all the stock held by the plan and invested the proceeds in fixed-income securities, in order to protect the participants against the risk that while the plan remained in effect the price of ADM stock would fall. Implicit in the plaintiffs' argument is that at the very least the trustees should have sold as much ADM stock as necessary to enable the plan to acquire a diversified portfolio of stocks. The former route would have protected the plan's participants from swings in the stock market, the latter from swings in ADM stock.

Of course, the upside would have been truncated along with the downside; if ADM did better than the stock or bond markets—and no one could know at the time of the

acquisition of Moorman what the future held for ADM— then the participants in the Moorman plan would be better off as a result of the trustees' retaining the ADM stock. But assuming that the plan's participants were risk averse, a truncated distribution of expected returns would have been preferable ex ante (that is, when the trustees' decision to hold onto the ADM stock was made), as well as ex post (we know that ADM's stock fell by more than the stock market as a whole and the market for fixed-income securities as well), even if the average of those returns would be no higher or even somewhat lower. Risk-averse people will pay to avoid risk, as they do when they buy insurance knowing that an insurance premium includes a loading charge (that is, a fee to compensate the insurance company for its administrative expenses) on top of the estimate of the loss to the insured discounted by the probability that the loss will occur. That discounted loss would be the actuarial value of the policy, and a risk-neutral person would pay no more. In fact he would never buy insurance, because there is always a loading charge. Most people are assumed to be risk averse when it comes to investing for retirement because they will have limited alternative sources of income once they stop working. The participants in a pension plan are the investors even if the employer alone contributes to the plan, since, as we mentioned, there is no free lunch. An employer who had no pension obligations would pay his employees higher wages, and they would then make their own arrangements for retirement.

From the presumed risk aversion of employees with regard to their retirement income follows the duty of a pension fund's trustees to diversify the fund's assets; for risk is reduced by diversification. "Because the value of any single stock or bond is tied to the fortunes of one company, holding a single kind of stock or bond is very risky. By contrast, people who hold a diverse portfolio of stocks and

bonds face less risk because they have only a small stake in each company." N. Gregory Mankiw, *Principles of Economics* 546 (1998); see also Stephen B. Cohen, "The Suitability Rule and Economic Theory," 80 *Yale L.J.* 1604, 1634 (1971). In other words, if one holds stocks whose price behavior is uncorrelated or at least not perfectly correlated, the variance of the portfolio will be less than the variance of individual stocks. *The Modern Theory of Corporate Finance* 6 (Clifford W. Smith, Jr., ed., 2d ed. 1990). Fixed-income securities exhibit less variance, hence less risk, than stock. In both cases the variance avoided is greater the shorter the investment horizon. Someone who is going to have to sell stock in a month risks having to sell at a market low, whereas if he can defer the sale indefinitely he is less likely to be hurt because the long-run trend of stock prices is upward.

The MMC Employees Profit Sharing Plan both was underdiversified and had a very short investment horizon once ADM decided to terminate it. But these things do not demonstrate imprudence in the management of an ESOP, at least on the basis of the record compiled in the district court, which is all we have to go on. When ADM acquired Moorman the plan was underdiversified, what with 65 percent of its assets consisting of stock in the Moorman company. Yet there is no suggestion that the trustees were imprudent *before* the acquisition in holding such an unbalanced portfolio, because that is a form of "imprudence" expressly authorized for ESOPs. If ESOPs had to be diversified they would fail in their purpose of encouraging employees' ownership of their employer's stock. Imagine if the MMC plan had owned the same proportion of Moorman stock as the proportion of that stock in all stock traded on all major exchanges here and abroad—an infinitestimal percentage.

Thus, had the acquisition not occurred, 18 months later the plan participants would have been in the same position as before, holding shares in a severely underdiversified plan. Instead they found themselves holding shares in a no more severely underdiversified plan and indeed one less exposed to a type of risk that we have not yet mentioned—the risk of bankruptcy, which was greater for Moorman than for the giant ADM. For all we know, the market forces that dragged down the price of ADM stock during the 18-month period between termination and distribution would have dragged Moorman over the brink had it not been acquired.

ADM could, moreover, without courting an accusation of imprudence, have made a "trust to trust" transfer, whereby the assets of the MMC plan, consisting after the acquisition mainly of ADM shares as we know, would simply have been poured into ADM's ESOP. *Hunter v. Caliber System, Inc.*, 220 F.3d 702, 718-19 (6th Cir. 2000); *Kuper v. Iovenko, supra*, 66 F.3d at 1456-57; see also *Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660, 665-67 (6th Cir. 1998); *Blaw Knox Retirement Income Plan v. White Consolidated Industries, Inc.*, 998 F.2d 1185, 1189-90 (3d Cir. 1993). As these cases (one of which, *Kuper*, involved an ESOP) explain, a decision to transfer trust funds from one trust to another, which is a typical incident of a corporate merger or reorganization, is not a fiduciary act. The trust funds themselves remain intact, and the new trustees are fully subject to the fiduciary duties that the law imposes on trustees. ADM might well have done this. The participants would have swapped shares in a small company (Moorman) for shares in a giant (ADM), and so would have been better off from an ex ante perspective: if one had asked the participants in the MMC plan, would you rather have Moorman shares or ADM shares, undoubtedly they would have said ADM shares.

Certainly this would be true of risk-averse investors, and, as we said, most investors for retirement are risk averse.

The procedure followed by ADM achieved the same result—assuming that the relevant terms of the two plans are the same. If ADM's ESOP plan is easier to cash out of than the MMC ESOP plan, a trust-to-trust transfer might actually have reduced the risk borne by participants in the latter plan compared to the procedure adopted because any cash that a participant gets his hands on he can invest in a diversified portfolio of stocks, or for that matter in fixed-income securities; and the sooner he gets the cash, the sooner he can take these measures of self-protection. But there is no evidence that ADM's ESOP plan is easier to cash out of than the MMC plan—the ADM plan is not in the record—and the plaintiffs bore the burden of proof. They also failed to introduce evidence of the overall risk created by the retirement package that they acquired when they became employees of ADM.

Some didn't become employees of ADM. But it seems that they remained participants in a Moorman defined-benefit plan, as well as in the MMC plan at issue in this case. Those Moormanites who did go with ADM also, as we noted earlier, became participants in what we believe is a conventional defined-benefit plan. (In addition, Moorman had a 401(k) plan that rolled over into a similar plan of ADM's.) We do not know all the terms of these plans or what they were worth to the participants. But for all that appears, the shares of ADM that loom so large when only the MMC ESOP plan is considered represent only a small part of the participants' overall holdings. It is conceivable that taken as a whole the plaintiffs' retirement assets are adequately diversified and that—a related point—the fact that some of them have a short time horizon is not a hardship. It was the plaintiffs' burden to show the contrary.

One can imagine a situation in which a trust-to-trust transfer, or the similar-seeming substitute at issue in this case, would trigger a duty of sale on the part of the trustees, even in the ESOP context where there is no duty to diversify *as such*. There is still a duty of prudence. 29 U.S.C. § 1104(a)(1)(B); *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917, subsequent appeal, 61 F.3d 599 (8th Cir. 1995); *Fink v. National Savings & Trust Co.*, 772 F.2d 951, 955 (D.C. 1985); *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983); *Eaves v. Penn*, 587 F.2d 453, 460 (10th Cir. 1978). And in particular cases it might, as pointed out in *In re Hemmeter*, 242 F.3d 1186, 1191 n. 2 (9th Cir. 2001); *Kuper v. Iovenko*, *supra*, 66 F.3d at 1458, and *Moench v. Robertson*, *supra*, 62 F.3d at 568, become a duty to diversify, even though failure to diversify an ESOP's assets is not imprudence per se, 29 U.S.C. § 1104(a)(2), as that would bring in the duty to diversify by the back door.

Suppose that all or most of the plan participants were just 18 months short of retirement (in fact the average age of the participants in the MMC plan was only 45), the ESOP was their principal retirement asset (we don't know whether it was or not) and was entirely invested in the stock of their employer (but here it was 65 percent, not 100 percent), and their employer was bought in a stock-for-stock deal—so that all the assets of the ESOP became stock in the acquirer—by a company that had a much higher debt-equity ratio than their (former) employer and as a result its stock price was much more volatile and its bankruptcy risk greater. Then, even if the trustees did not predict the company's "impending collapse" (*Moench v. Robertson*, *supra*, 62 F.3d at 572), they might be required in the interest of the participants either to diversify the plan's stockholdings or to exchange the ADM stock for Treasury bills. But the plaintiffs did not attempt to show that this is such a case.

AFFIRMED.

A true Copy:

      Teste:

                              _____
                              *Clerk of the United States Court of*
                              *Appeals for the Seventh Circuit*