In the

# United States Court of Appeals
### For the Seventh Circuit

No. 11-2660

LINDA WHITE, on behalf of herself and
a class of persons similarly situated, and
CHARLENE L. ROUNDTREE,

*Plaintiffs-Appellants*,

*v.*

MARSHALL & ILSLEY CORPORATION, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 2:10-cv-00311-JPS—**J.P. Stadtmueller**, *Judge.*

ARGUED SEPTEMBER 13, 2012—DECIDED APRIL 19, 2013

Before MANION, SYKES, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* When financier J. Pierpont Morgan was asked what the stock market would do, he answered, according to Wall Street legend, "It will fluctuate." Sometimes it fluctuates a lot, as the sponsor of the retirement savings plan in this case understood

well. This case is about how federal law applies to such fluctuations in the value of an employee stock ownership plan.

This case is one in a series alleging that fiduciaries of employee retirement savings plans acted imprudently by allowing employees to choose to buy and hold an employer's stock while it declined significantly in price. See, *e.g.*, *Dudenhoefer v. Fifth Third Bancorp*, 692 F.3d 410 (6th Cir. 2012), *petition for cert. filed*, No. 12-751 (Dec. 14, 2012); *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267 (11th Cir. 2012); *Pfeil v. State Street Bank & Trust Co.*, 671 F.3d 585 (6th Cir. 2012); *Gearren v. The McGraw-Hill Cos.*, 660 F.3d 605 (2d Cir. 2011); *In re Citigroup ERISA Litigation*, 662 F.3d 128 (2d Cir. 2011); *Howell v. Motorola, Inc.*, 633 F.3d 552 (7th Cir. 2011).

Such cases are governed by the federal Employee Retirement Income Security Act of 1974, better known as ERISA. 29 U.S.C. § 1001 *et seq.* As in most of these cases, the plaintiffs here alleged that the plan fiduciaries violated ERISA by continuing to offer employer stock as an investment option while the stock price dropped, in this case during the financial crisis of 2008-2009. In the absence of allegations of misrepresentations or other wrongful conduct not alleged here, plaintiffs in such cases under ERISA must try to hit a very small and perhaps non-existent target. The theory — that the employer and plan fiduciaries violated their duty of prudence under ERISA by continuing to offer employer stock as an investment option — would require the employer and plan fiduciaries, in this case and many similar cases, to

violate the retirement plan's governing documents, which employers and plan fiduciaries are also required to follow under ERISA. The theory also seems to be based often on the untenable premise that employers and plan fiduciaries have a fiduciary duty either to outsmart the stock market, which is groundless, or to use insider information for the benefit of employees, which would violate federal securities laws.

Defendant Marshall & Ilsley Corporation (M&I Bank) offered its employees an individual account retirement savings plan, which we call "the Plan." The Plan allowed employees to choose how to distribute their savings among more than twenty investment funds with different risk and reward profiles. The investment funds offered by the Plan were selected by the Plan's fiduciaries. ERISA imposes on a plan's fiduciaries a duty of prudence, meaning that they must select only prudent investment options to include in the plan. 29 U.S.C. § 1104.

One of the investment options in the Plan was the M&I Stock Fund which consisted of M&I stock. This type of fund is called an Employee Stock Ownership Plan or ESOP. See 29 U.S.C. § 1107(d)(6). During the housing market collapse and subsequent market crash in 2008 and 2009, M&I's stock price dropped by approximately 54 percent, as did the value of employees' investments in the M&I Stock Fund.

The employees filed this putative class action under ERISA, 29 U.S.C. § 1132(a), alleging that the Plan's fiduciaries violated their duty of prudence under section 1104

by continuing to offer the M&I Stock Fund as one of the options in the Plan despite the stock's poor performance. In claims of imprudence against fiduciaries of ESOPs, many federal courts have applied a presumption that the fiduciaries acted prudently. The district court applied this presumption of prudence, found that plaintiffs' allegations could not overcome it, and granted the defendants' motion to dismiss the case under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for relief. *White v. Marshall & Ilsley Corp.*, Nos. 10-311, 10-377, 2011 WL 2471736 (E.D. Wis. June 21, 2011). The district court did not reach the issue of class certification.

Plaintiffs have appealed. The Secretary of Labor has filed an amicus brief regarding the proper legal standard in such cases, focusing in particular on the presumption of prudence that we and other courts have used in such cases. Even when we accept as true plaintiffs' allegations, as we must when we review a dismissal under Rule 12(b)(6), we agree with the district court that the Plan fiduciaries here benefit from a presumption of prudence and that the plaintiffs' allegations do not overcome that presumption. We therefore affirm the judgment of the district court.

I. *Factual Allegations*

   A. *The M&I Retirement Plan*

M&I Bank sponsored a retirement savings fund for its employees called the M&I Retirement Program. The Plan

was subject to ERISA's rules governing employee retirement savings plans, under which the Plan was considered an Employee Individual Account Plan or EIAP because employees selected the funds for investing their savings from among options chosen by the Plan fiduciaries. 29 U.S.C. § 1107(d)(3).[1] Under the Plan, employees could choose how to allocate their investments among the twenty-two funds in one-percent increments. Employees could shift their new contributions and existing investments to different investment options at any time.

This arrangement was laid out in the Plan's governing document. The Plan was implemented and managed in accordance with the governing document by the Plan's fiduciaries. The named fiduciary of the plan was M&I Bank itself, and the Plan was overseen by an Investment Committee that consisted of several M&I directors, all of whom are defendants here.

The Plan's governing document permitted the Investment Committee to select the funds that would be available in the plan, but it specifically required that one particular investment be one of the Plan's investment funds — the M&I Stock Fund. Plan § 16.02(b). The M&I Stock Fund consisted entirely of M&I's common stock, apart from a small amount of cash or money market funds to meet immediate cash needs. This type of investment fund — one investing primarily in the employer's

---

[1] The Plan is a "defined contribution" plan under ERISA because the employees bear the risks of loss and benefit from gains on their invested contributions. 29 U.S.C. § 1002(34).

stock — is considered an Employee Stock Ownership Plan or ESOP under ERISA. 29 U.S.C. § 1107(d)(6). The Plan's governing document required that the M&I Stock Fund be offered in the Plan and that it invest in M&I stock at all times, regardless of any "reversals of fortune."

Regarding the prospect of "reversals of fortune," the Plan used strong language. It recognized the likelihood of significant declines in stock price from time to time, but took a long-term view and directed the Plan fiduciaries to allow for alignment of the interests of employees and the corporation:

> Marshall & Ilsley Corporation, as the settlor of the Plan and the Trust, hereby declares that its intent and purpose in creating the M&I Fund is to align the interests of Plan Participants with Marshall & Ilsley Corporation. Marshall & Ilsley Corporation believes that its success as an entity and the performance of the M&I Fund will both be enhanced and facilitated in the long run by such alignment. At the same time, Marshall & Ilsley Corporation recognizes that the performance of a business fluctuates and the valuation of stock fluctuates. *As a result, it is possible that M&I's business and the value of the M&I Fund could decline significantly (even to the point where Marshall & Ilsley Corporation's ongoing viability comes into question*). Nevertheless, Marshall & Ilsley Corporation, as the settlor of the Plan and Trust, intends and declares that neither the Committee nor any other Plan fiduciary shall have any authority or ability to cause the M&I Fund to be invested in anything but M&I

> stock, except for liquidity needs as discussed in paragraph (b) above. Marshall & Ilsley Corporation believes that, should it suffer reversals of fortune, *the alignment of the interests of Plan Participants and Marshall & Ilsley Corporation may be the very thing which will enable Marshall & Ilsley Corporation to again prosper*. In sum, Marshall & Ilsley Corporation, as settlor of the Plan and Trust, hereby declares that it is its intent and command that there can be no change in circumstances or event (*no matter how dire*) which would allow the Committee or any other Plan fiduciary to shift investment of the M&I Fund into investments other than M&I stock (except for liquidity needs as discussed in paragraph (b) above).

Plan § 16.02(f) (emphases added); see also § 16.02(b). Thus, the Plan's governing document required the fiduciaries to maintain the M&I Stock Fund under all circumstances, "no matter how dire."

### B.  *Allegations of Imprudence*

Plaintiffs allege that M&I and the Plan fiduciaries breached their duty of prudence under ERISA by continuing to offer the M&I Stock Fund as an investment option in the Plan during a period of significant decline in the market value of M&I stock. Like many other financial institutions in 2008 and 2009, M&I Bank suffered significant losses in the wake of the collapse of the housing market and the financial crisis of the autumn of 2008 and following. Plaintiffs claim that amidst this turmoil, the Plan fiduciaries should have

violated the terms of the Plan, sold the M&I stock held by the Plan, and removed the M&I Stock Fund as one of the options in the Plan because M&I stock was over-valued and too risky an investment for retirement savings.

According to plaintiffs, M&I's problems began when M&I expanded too quickly into risky loans outside its familiar geographic area and its usual loan types. Many of these loans failed, which led to significant net losses and credit-quality deterioration and forced the bank to tap deeply into capital reserves. Observers and analysts recognized that M&I was in poor financial condition at the end of 2008. They repeatedly downgraded M&I bonds and stock because of the poor quality of the loans in M&I's portfolio. Plaintiffs allege that these problems caused the price of M&I stock to drop dramatically and "created dire financial circumstances" that would inevitably result in significant losses to plan participants, Complaint ¶ 143, or at least increase the riskiness of the investment to intolerable levels. Complaint ¶ 75.

The Complaint identifies several assessments of M&I's financial condition that plaintiffs allege indicated the riskiness of M&I's stock: in 2008 M&I's stock was downgraded by four major investment banks; in November 2008 M&I received federal funds as part of the Troubled Asset Relief Program (TARP); in December 2008 Audit Integrity identified M&I as a "very risky company;" by April 2009 six percent of M&I's loans were nonperforming, and on August 14, 2009 Bloomberg News noted that M&I was one of several banks with at least five percent "toxic" loans and quoted a finance

expert as saying that at five percent toxicity, "chances are regulators have them classified as being in unsafe and unsound condition;" on September 14, 2009 the Pittsburgh Tribune Review opined that "the biggest loser in the S&P 500 this year is Marshall & Ilsley Corp.;" and by April 2010 M&I reported its sixth consecutive quarter of loss.

Plaintiffs sought compensation for loss of value in their retirement savings during the class period from November 10, 2006 to April 21, 2010.[2] In the district court, plaintiffs alleged and argued that the fiduciaries failed to provide beneficiaries with accurate information about the company's financial condition, and that M&I failed to monitor other fiduciaries adequately and failed to provide them with accurate information. Plaintiffs have not pursued those theories on appeal. Plaintiffs focus all their attention on appeal on their claim for breach of the duty of prudence.

From the beginning of the class period to the end of the period, M&I stock dropped 54 percent, from $46.92 per share to an adjusted value of $21.43 per share. Appellee Supp. App. 11-30. This price is adjusted to include both the value of M&I stock and the value of

---

[2] Unlike plaintiffs suing for securities fraud, plaintiffs can sue under ERISA even if they simply held their investments. There is no purchase or sale requirement for fiduciary duty claims under ERISA. Compare 15 U.S.C. § 78j and *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), with 29 U.S.C. §§ 1104(a)(1), 1109.

the stock of two spinoff entities — Metavante and FIS — whose stock M&I shareholders were permitted to retain when those stocks spun off from M&I. The Plan was also amended to allow the M&I Stock Fund to hold those two stocks. Thus, while M&I's nominal stock price at the end of the proposed class period was $9.94, the parties agree that the total value of a shareholder's investments from one share of M&I stock should be adjusted to include the converted spin-off shares, which was $21.43 at the end of the class period.[3]

During the class period, M&I stock bottomed out at an unadjusted nominal price of $3.11 per share on March 5, 2009. *Id*. In a deal announced December 17, 2010, Bank of Montreal (BMO) agreed to acquire M&I Bank for $7.75 per share, an approximate 33 percent premium over M&I's nominal closing stock price on December 16, 2010 of $5.79.

---

[3] When Metavante split off from M&I on November 2, 2007, shareholders received .333 shares of Metavante stock for each share of M&I stock. When Metavante was acquired by FIS on October 1, 2009, Metavante shareholders received 1.35 shares of FIS stock for each share of Metavante stock. These calculations assume that M&I shareholders maintained ownership of the transferred stock through both spinoffs, as employees were permitted to retain their Metavante stock when it spun off from M&I. The adjusted M&I price includes the nominal price of M&I itself plus the added value of the Metavante and then FIS stock. See Supp. App. 30.

II. *Analysis*

We review *de novo* a district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), and we take all factual allegations as true and draw all reasonable inferences in favor of the plaintiffs. *Pugh v. Tribune Co.*, 521 F.3d 686 (7th Cir. 2008). Courts can take judicial notice of public stock price quotations without converting a motion to dismiss into one for summary judgment. *E.g., id.* at 691 n.2. We can also consider ERISA plan documents that were attached to the complaint or referenced in it without converting the motion to one for summary judgment. See *Venture Associates Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).

A. *Fiduciary Duties Under ERISA*

ERISA's primary goal is to protect employee interests in pensions, retirement savings, and other benefit plans. 29 U.S.C. § 1001(b); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983); ("ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans."). To accomplish this goal, ERISA imposes duties on the fiduciaries who manage plans. These duties include duties to invest prudently, to comply with plan documents, and to diversify investments. 29 U.S.C. § 1104(a)(1)(B), (C), (D). This last duty, to diversify, runs counter to the purpose of ESOPs, which by definition concentrate investment in a single employer stock. See

*Steinman v. Hicks*, 352 F.3d 1101, 1104 (7th Cir. 2003). But Congress favors ESOPs as a policy matter because they provide a way for employers to align employee and management interests. See Tax Reform Act of 1976, Pub. L. No. 94-455, § 803(h), 90 Stat. 1520, 1590 (1976) (noting Congress's interest in "encouraging employee stock ownership plans as a bold and innovative method of strengthening the free private enterprise system"). To preserve and encourage ESOPs, Congress exempted fiduciaries of ESOPs from the duty to diversify and limited the duty of prudence so as not to require diversification for such plans. 29 U.S.C. § 1104(a)(2).

The other ERISA duties — to manage retirement plans prudently and to follow plan documents — still apply to ESOP fiduciaries and are relevant here. Section 1104 is entitled "Prudent man standard of care." It requires fiduciaries to discharge their duties for the purposes of providing benefits to participants and their beneficiaries, 29 U.S.C. § 1104(a)(1)(A)(i), and to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," § 1104 (a)(1)(B). This duty requires fiduciaries to select only prudent investments for an employee individual account plan, *Howell v. Motorola, Inc.*, 633 F.3d 552, 567 (7th Cir. 2011), though without providing specific guidance as to what it means for an investment option to be prudent. Complicating matters further, section 1104 also requires fiduciaries to act "in accordance with the documents and instruments gov-

erning the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter." 29 U.S.C. § 1104(a)(1)(D).[4]

### B.  *Fiduciary Duties for Employee Stock Ownership Plans*

ESOP fiduciaries must comply with the statutory duties both to act prudently and to comply with the plan's governing documents unless the documents are inconsistent with ERISA. In the context of ESOPs, plan documents and the duty of prudence may point fiduciaries in different directions. As here, ESOPs' governing documents typically direct fiduciaries to invest primarily in employer stock, creating a duty under section 1104(a)(1)(D) to follow the plan documents and to maintain that investment or investment option. But if the company's viability is in jeopardy, the employer's stock may not be

---

[4]  This statutory duty originates in trust law, which requires a trustee to act in accord with the terms of the trust. Restatement (Third) of Trusts § 91 (2007); see also *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1280-81 (11th Cir. 2012) (citing Restatement § 91 in analyzing challenge to ESOP fiduciaries). Trust law serves as the basis for much of ERISA, see *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989), though "trust law does not tell the entire story," because, "[a]fter all, ERISA's standards and procedural protections partly reflect a congressional determination that the common law of trusts did not offer completely satisfactory protection." *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996).

a prudent investment. In such cases, employees might argue that the statutory duty of prudence requires a fiduciary to remove the employer stock fund as an option for employee investments or to redirect that fund to other stocks. When an employer is in poor financial condition and its stock price is falling, the mandates to follow plan documents and to act prudently might thus pull fiduciaries in two opposite directions: both to keep the employer stock option and to remove it. This, at least, is the theory on which so many ESOP cases have been built.

Plaintiffs allege that there was such a conflict here. The M&I Plan fiduciaries kept the M&I Stock Fund as an option throughout M&I stock's descent until the ultimate acquisition by the Bank of Montreal. The plaintiffs claim that in doing so, the fiduciaries violated the duty of prudence. But if the fiduciaries had done the opposite — removed the fund when M&I's stock price was low — the plaintiffs could have claimed that the same fiduciaries were liable for the gains employees missed when M&I's stock price subsequently increased. In that case, the claim would be that the fiduciaries violated the Plan's governing documents by removing the M&I Stock Fund as an investment option. For example, after M&I stock reached its lowest point in the proposed class period, it increased in value by more than 150 percent by the end of the class period — from an adjusted low price of $8.46 to an adjusted price of $21.43 — a gain that was generally in line with the broader market recovery. If the fiduciaries had chosen to violate the terms of the Plan and had forced a sale of employees' M&I

stock at the lowest point, the employees would have lost out on the later increase in value and would seem to have had viable claims under ERISA for the fiduciaries' failure to comply with the terms of the Plan document.

To the extent that courts allow liability for either following plan documents or departing from them, fiduciaries could be liable either for the company stock's poor performance if they continue to invest in employer stock, or for missing the opportunity to benefit from good performance if they do not. This logic puts ESOP plan fiduciaries in a precarious position that threatens to make them guarantors of good investment performance. We have referred to this precarious position as sitting on a "razor's edge." *Armstrong v. LaSalle Bank National Ass'n*, 446 F.3d 728, 733 (7th Cir. 2006). Such a high exposure to litigation risks in either direction could discourage employers from offering ESOPs, which are favored by Congress, or even from offering employee retirement savings plans altogether. See generally *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996) (courts interpreting ERISA must consider several goals of Congress, including not unduly discouraging employers from offering welfare benefit plans in the first place); *Hockett v. Sun Co.*, 109 F.3d 1515, 1522, (10th Cir. 1997) (same for retirement plans).

C.  *The Moench Presumption*

Courts have taken this precarious position into account when deciding how to apply ERISA's duty of prudence to ESOPs when the employer's stock price

drops significantly enough to provoke litigation. Beginning with *Moench v. Robertson* in the Third Circuit and continuing in many cases that followed, federal courts have tempered the risk of liability for fiduciaries in these circumstances by applying a presumption that the fiduciaries acted prudently. In *Moench*, the Third Circuit considered whether fiduciaries of an ESOP violated their duty of prudence by continuing to invest employee funds in company stock throughout the company's descent toward eventual bankruptcy. 62 F.3d 553 (3d Cir. 1995).

*Moench* involved a type of retirement savings plan different from the one here. In *Moench*, the ESOP did not give employees a choice among different investments. It was instead a stand-alone fund, and its primary purpose was to provide employees the opportunity to invest in employer stock. The fund required the fiduciaries to invest the fund in employer stock, and plaintiffs alleged it was imprudent to continue to invest that fund in employer stock. In the case of M&I Bank, by contrast, the employer stock fund was just one of many options available for employees to choose among in their retirement savings plan, and plaintiffs alleged that fiduciaries breached their duty of prudence by merely offering the ESOP as one of the funds. Courts facing prudence claims where ESOPs allow such employee choice similarly apply the *Moench*'s presumption. See *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267 (11th Cir. 2012); *In re Citigroup ERISA Litigation*, 662 F.3d 128 (2d Cir. 2011). In view of the choices available to employees, the reasons supporting the *Moench* presumption seem to apply with even more force in such cases.

The court in *Moench* acknowledged the tension inherent between ERISA's duty of prudence and the ESOP's direction to invest in employer stock. The *Moench* court held that plan language directing the fund to be invested primarily in employer stock did not necessarily doom a plaintiff's claim that the fiduciary breached the duty of prudence by continuing to invest in it. Instead, the court attempted to balance the potentially conflicting directions by giving fiduciaries managing ESOPs a degree of deference that is high but not complete. The court held that

> an ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision. However, the plaintiff may overcome that presumption by establishing that the fiduciary abused its discretion by investing in employer securities.

62 F.3d at 571.

Adding more specific content to this reasoning, the *Moench* court explained that a fiduciary would be found to have abused its discretion by continuing to permit investment in the employer's stock only if "the ERISA fiduciary could not have reasonably believed that continued adherence to the ESOP's direction was in keeping with the settlor's expectations of how a prudent trustee would operate." *Id*. Thus, under *Moench*, courts presume that where plan language directs fiduciaries to offer employer stock, an ESOP fiduciary's decision to continue offering employer stock is prudent unless the plaintiffs show that, despite the instructions in the plan,

the circumstances were so compelling that no reasonable fiduciaries would have thought they should continue to offer the stock as directed in the plan. The plaintiff must show that, "'owing to circumstances not known to the settlor and not anticipated by him [the making of such investment] would defeat or substantially impair the accomplishment of the purposes of the trust.'" *Id.*, quoting Restatement (Second) Trusts § 227 comment g.

This general approach, known as the "*Moench* presumption," has been widely adopted by other circuits in cases alleging imprudence by either investing in an ESOP or allowing employees to choose to do so. See *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1280-81 (11th Cir. 2012) (collecting cases); *In re Citigroup ERISA Litigation*, 662 F.3d 128, 138 (2d Cir. 2011) (adopting *Moench* presumption because "it provides the best accommodation between the competing ERISA values of protecting retirement assets and encouraging investment in employer stock"); *Quan v. Computer Sciences Corp.*, 623 F.3d 870, 881 (9th Cir. 2010) ("if properly formulated, the *Moench* presumption can strike the appropriate balance between the employee ownership purpose of ESOPs and other EIAPs, and ERISA's goal of ensuring proper management of such plans"); *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 254 (5th Cir. 2008) ("The *Moench* presumption logically applies to any allegations of fiduciary duty breach for failure to divest an EIAP or ESOP of company stock.").

Courts applying the *Moench* presumption have held that plaintiffs seeking to overcome the presumption

must allege and ultimately prove that the company faced "impending collapse" or "dire circumstances" that could not have been foreseen by the founder of the plan. See, *e.g.*, *Citigroup*, 662 F.3d at 140; *Quan*, 623 F.3d at 882 ("plaintiffs must therefore make allegations that 'clearly implicate[ ] the company's viability as an ongoing concern' . . ."); *Kirschbaum*, 526 F.3d at 255-56 (affirming summary judgment for defendant where no evidence showed that company's "viability as a going concern was ever threatened, nor that [its] stock was in danger of becoming essentially worthless"). A significant decline in stock price is not enough, unless perhaps it is combined with other evidence of impending collapse, mismanagement, or internal conflicts of interest. See *Quan*, 623 F.3d at 884 ("'[m]ere stock fluctuations, even those that trend downward significantly, are insufficient to establish the requisite imprudence to rebut the *Moench* presumption'"), quoting *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1099 (9th Cir. 2004); see also *Moench*, 62 F.3d at 572 (vacating grant of summary judgment for defendants where stock drop was accompanied by insider knowledge of impending collapse and insider conflicts of interest, and remanding for further proceedings in light of presumption of prudence).

Our circuit has used the *Moench* presumption in deciding imprudence claims against ESOP and EIAP fiduciaries. In *Howell v. Motorola, Inc.*, 633 F.3d 552 (7th Cir. 2011), we considered whether fiduciaries of an EIAP acted prudently in continuing to offer employer stock as one of eight investment options in the plan. In affirming summary judgment for the defendant fidu-

ciaries, we acknowledged the *Moench* presumption for traditional ESOPs and noted that the defendants' decision to keep company stock as one option "must be evaluated against that backdrop." *Id*. at 568. In *Armstrong v. LaSalle Bank*, 446 F.3d 728 (7th Cir. 2006), we reviewed an ESOP trustee's decision deferentially, noting that although we typically do not defer to fiduciaries under ERISA, "a decision that involves a balancing of competing interests under conditions of uncertainty requires an exercise of discretion, and the standard of judicial review of discretionary judgments is abuse of discretion." *Id.* at 733. In that case, though, we reversed summary judgment in favor of the trustee of an ESOP whose stock was not publicly traded and whose employees did not have choices about investing in the ESOP. There were genuine issues of fact concerning whether the fiduciary actually exercised its discretion in taking the actions at issue.

We have suggested that plaintiffs in ESOP cases under ERISA can overcome the *Moench* presumption of prudence by showing that fiduciaries' actions created excessive and unreasonable risk for employees, given all the relevant circumstances, in addition to the showing of "dire circumstances" or "impending collapse" recognized by other circuits. In two cases addressing prudence challenges to the management of single ESOP funds (not EIAPs offering employer stock as one option, as here), we emphasized the relevance of the amount of risk the fiduciaries imposed upon the participants. In *Steinman v. Hicks*, 352 F.3d 1101 (7th Cir. 2003), we affirmed summary judgment for fiduciaries. We

hypothesized, though, that prudence might require fiduciaries to diversify employer stock funds in circumstances presenting unusually severe financial risks to participants: for example, if all plan participants were close to retirement, participants held most of their retirement savings in the ESOP, all funds were invested in the employer stock, and the employer's stock was converted into another company's stock with greater volatility and bankruptcy risk. *Id.* at 1106.

In *Summers v. State Street Bank & Trust Co.*, 453 F.3d 404 (7th Cir. 2006), we again affirmed summary judgment for fiduciaries of an ESOP after the company (United Airlines) went into bankruptcy. We reasoned that the duty to abandon a preference for employer stock is based on how much risk the employer's situation imposes on the employees. Whether risk is excessive would depend on "the amount and character of the employees' other assets." *Id.* at 411. In *Howell*, we extended this risk analysis to a challenge to the offering of an ESOP in an EIAP, noting that where several other investment options were available to participants, "no participant's retirement portfolio could be held hostage to [the company's] fortunes." 633 F.3d at 569.

In this case, we again follow the reasoning of *Moench* and its progeny. With inevitable fluctuations in the stock market, ERISA's simultaneous demands to comply with plan documents and to exercise prudence in choosing investment options for plan participants can place fiduciaries on a razor's edge. If ESOPs are to fulfill their purposes, fiduciaries who invest in em-

ployer stock, or who allow employees to choose to invest in it, in compliance with the terms of the plan need substantial protection from liability for doing so. Without this shield, the duty of prudence would leave fiduciaries exposed to liability based on 20-20 hindsight for mere swings in the market or other foreseeable circumstances in which reasonable fiduciaries and other investors could easily disagree about the better course of action.

This potential conflict for ESOP fiduciaries leads us to afford them significant deference when their prudence is challenged for complying with plan requirements. In the absence of some other sort of wrongdoing, no longer alleged here, the standard for making a showing of imprudence by fiduciaries of an ESOP or EIAP should be high. The fiduciaries' role at the intersection of the duties to act prudently and to follow plan documents exposes them to liability for either following or not following plan directions in cases like this.

Plaintiffs and the Secretary of Labor urge us not to apply a presumption of prudence here or, in the alternative, to make it easier for plaintiffs to overcome the presumption either by relaxing the standard required to overcome it or by treating the presumption as an evidentiary burden rather than a pleading requirement. We decline to adopt these positions.

As we have explained, the *Moench* presumption is appropriate in this context, where the dual requirements of ERISA — to comply with plan language and to act with prudence — threaten to place ESOP fiduciaries on a razor's edge. As to its application at the pleading stage,

the presumption of prudence is not an evidentiary standard but a substantive legal standard of liability and conduct. Thus, we agree with the Second, Third, and Eleventh Circuits that a claim against ESOP fiduciaries alleging a violation of the duty of prudence may be dismissed at the pleading stage if the plaintiffs do not make allegations sufficient to overcome the presumption of prudence. See *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1281 (11th Cir. 2012) ("The *Moench* standard of review of fiduciary action is just that, a standard of review; it is not an evidentiary presumption. It applies at the motion to dismiss stage as well as thereafter."); *In re Citigroup ERISA Litigation*, 662 F.3d 128, 139 (2d Cir. 2011) ("The 'presumption' is not an evidentiary presumption; it is a standard of review applied to a decision made by an ERISA fiduciary."); *Edgar v. Avaya, Inc.*, 503 F.3d 340, 349 (3d Cir. 2007) (affirming dismissal on the pleadings and finding *Moench* presumption is appropriately applied at pleading stage; there is "no reason to allow this case to proceed to discovery when, even if the allegations are proven true, [the plaintiff] cannot establish that defendants abused their discretion").

We also reject the standard for overcoming the presumption of prudence urged upon us by the Secretary and plaintiffs — the same standard adopted by the Sixth Circuit in *Pfeil* — that plaintiffs can overcome the presumption by showing that "a prudent fiduciary acting under similar circumstances would have made a different investment decision." *Pfeil v. State Street Bank & Trust Co.*, 671 F.3d 585, 591 (6th Cir. 2012). We do not believe the presumption would sufficiently protect fi-

duciaries facing conflicting demands if it could be over-come so easily. Plaintiffs and the Secretary argue here that under the Sixth Circuit's standard, plaintiffs could overcome the presumption by merely finding a finance expert who could, with the benefit of hindsight, claim that he would have made different investment decisions or chosen different investment options than the defendant fiduciaries did. If the *Moench* presumption were that easy to rebut, it would serve little purpose. ESOP fiduciaries would become insurers against loss from significant stock market losses. Showing that another investor would have invested differently does not shed meaningful light on the conduct of the defendant fiduciaries when faced with instructions to invest in employer stock, and to allow employees to do so, during inevitable but unpredictable periods of declining stock prices.[5]

---

[5] Recall that every time one investor sells a security that has fallen in price recently, another investor buys it in the hope that its price will increase. We do not intend to exaggerate the difference between our view and that of the Sixth Circuit. We do not necessarily disagree with the alternative holding in *Pfeil* that the plaintiffs in that case overcame the *Moench* presumption by alleging that the plan fiduciaries actually violated the terms of the plan. The plan in that case required divestment of employer (General Motors) stock if there was "a serious question concerning [General Motors'] short-term viability as a going concern without resort to bankruptcy proceedings." 671 F.3d at 592. The plaintiffs alleged that the company's independent auditors had stated "substantial

(continued...)

Instead, plaintiffs must show that no reasonable fiduciaries would have thought they were obligated to continue offering company stock. See *Moench*, 62 F.3d at 571. Sometimes ERISA plaintiffs — including the plaintiffs here — advance two theories to explain why offering employees the option of investing in employer stock might be imprudent. First, they may claim that the stock is overvalued and that investors are bound to lose money when the market inevitably corrects the price downward. Second, they may claim that the stock is excessively risky because, even if the market is pricing it correctly, the stock may be subject to price swings that certain investors cannot tolerate. ESOP participants often advance these theories after the employer's stock experiences a significant drop, claiming that the employer's "dire circumstances" put the plan fiduciaries on notice both that the stock was overvalued and that the stock was too risky.

We have fundamental doubts about the viability of ESOP prudence claims based on either theory, at least where (a) the employer's stock is publicly traded in an efficient market (meaning participants could have observed the dire circumstances themselves and acted accordingly) and (b) the employer's stock is only one investment option for employees who can shift their

---

[5] (...continued)
doubt" about the company's ability to continue as a going concern at least five months before the fiduciaries began to divest employer stock. *Id.*

investments with relative ease (and thus the stock imposes little risk upon employee-investors). In cases based on alleged overvaluation, claims that fiduciaries imprudently complied with plan documents to permit employees to buy and hold employer stock tend to be based on arguments that fiduciaries either: (1) failed to anticipate how their company or stock value would fare in the future, (2) failed to use non-public information available to them to increase the benefits to employees, or (3) failed to outsmart the rest of the market. None of these are acceptable bases for holding fiduciaries liable for loss.

The first is simply a lack of omniscience and foresight. That is not a basis for finding a breach of fiduciary duty. See *DeBruyne v. Equitable Life Assurance Society*, 920 F.2d 457, 465 (7th Cir. 1990) (refusing to find imprudence simply because fund lost money, noting ERISA "'requires prudence, not prescience'" (citation omitted)); *Quan*, 623 F.3d at 881 ("Fiduciaries are not expected to predict the future of the company stock's performance . . . .").

The second would require insiders to engage in investment transactions on the basis of material nonpublic information, which would violate federal securities laws. *Lanfear*, 679 F.3d at 1282 ("Just as plan participants have no right to insist that fiduciaries be corporate insiders, they have no right to insist that fiduciaries who are corporate insiders use inside information to the advantage of the participants."); *Quan*, 623 F.3d at 881 (the *Moench* presumption "gives fiduciaries a safe harbor

from failing to use insider information"); *Kirschbaum*, 526 F.3d at 256 ("[I]n some cases, requiring a fiduciary to override the terms of a company stock purchase plan could suggest the necessity of trading on insider information. Such a course is prohibited by the securities laws.").

The third would hold fiduciaries liable for failing to outsmart a presumptively efficient market. That is also not a sound basis for imposing liability. *Summers*, 453 F.3d at 408 ("A trustee is not imprudent to assume that a major stock market . . . provides the best estimate of the value of the stocks traded on it that is available to him."); see also *Nelson v. Hodowal*, 512 F.3d 347, 350 (7th Cir. 2008) ("Securities law assumes that markets for widely-traded stock . . . are efficient and impound all publicly available information."), citing *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). It would not be reasonable to impose any of these obligations on fiduciaries.

When we asked counsel for plaintiffs and counsel for the Secretary of Labor for other grounds for imposing liability, we received no specific answers. The plaintiffs' theory expects the impossible from fiduciaries, at least as long as we are dealing with an efficient market for a publicly traded stock, in which we assume the current market price incorporates all public information that is material to the stock value. See generally *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184, 1192 (2013) (describing efficient securities markets). Whenever a particular stock, a particular industry, or even an entire market experiences a

major change in prices, it will be possible to find a few people who predicted it and invested accordingly, and many others who did not. If the market is efficient, it is hard to see how ERISA could find a fiduciary imprudent for valuing a stock at its current market price. See *Summers*, 453 F.3d at 408, 412. Yet plaintiffs' theory is that the M&I fiduciaries were imprudent for failing to foresee the drop in M&I's stock price and for failing to see that the slide would continue.

Although fiduciaries cannot reliably predict when or how much stock will drop in the future, they can be reasonably certain that some high-impact, improbable events — including dramatic losses or gains in the stock market — are likely. See generally Nassim Nicholas Taleb, *The Black Swan* (2007). M&I Bank understood this when the Plan was established. The Plan contemplated the widest possible range of circumstances and directed plan fiduciaries to offer the M&I Stock Fund under all circumstances, "no matter how dire." The Plan went a step further in explaining the reasons for this instruction: "Marshall & Ilsley Corporation believes that, should it suffer reversals of fortune, the alignment of the interests of Plan Participants and Marshall & Ilsley Corporation may be the very thing which will enable Marshall & Ilsley Corporation to again prosper." Plan § 16.02(f). Instead of ignoring the wide range of potential swings the single employer stock fund could face, the Plan treated the employer stock fund as what it was — just one investment option among many, one that would give priority to investing in one's employer over investment diversity (and therefore risk mitigation).

The second theory — that fiduciaries imposed excessive risk upon participants — is equally problematic. There is no doubt that it is highly risky for an individual employee to invest heavily in the employer's stock. See *Summers*, 453 F.3d at 409-10; Lisa Meulbroek, *Company Stock in Pension Plans: How Costly Is It?*, 48 J.L. & Econ. 443, 448 (2005) (risk of investment in a single firm is double that in a diversified account); Shlomo Benartzi *et al.*, *The Law and Economics of Company Stock in 401(k) Plans*, 50 J.L. & Econ. 45, 49-50 (2007) (risk to employee of investment in single employer stock may be greater than Meulbroek's calculations because "it exposes them to idiosyncratic risk as well as to the possibility of suffering simultaneous reductions in both retirement savings and wages"); see also Vickie L. Bajtelsmit & Jack L. VanDerhei, Risk Aversion and Pension Investment Choices, in *Positioning Pensions for the Twenty-First Century* 45, 66 (Michael S. Gordon, *et al.* eds., 1997) (ESOPs are substantially riskier than diversified plans), citing Michael Conte & Rama Jampani, Financial Returns of ESOPs and Similar Plans, in *Pensions, Savings, and Capital Markets* (Dep't of Labor 1996). Remember, though, that the M&I Plan gave employees freedom to make their own investment choices from among many different investment options. Those options were chosen to give employees the ability to tailor an individual portfolio to fit any individual's tolerance for investment risk.

There is ample reason to worry that many employees will not understand the riskiness of an employer stock fund. See, *e.g.,* Richard Thaler & Cass R. Sunstein, *Nudge*

128-30 (revised ed. 2009), citing Boston Research Group, *Enron Has Little Effect on 401(k) Participants' View of Company Stock* (2002) (survey revealed most employees did not appreciate the risk of undiversified employer stock); Benartzi *et al.*, 50 J.L. & Econ. at 53-54 (past research and authors' research showed the same: "Only three of 10 respondents realize that company stock is riskier than a diversified stock fund."); Meulbroek, 48 J.L. & Econ. at 447-48 (summarizing research showing that employees tend to underestimate the riskiness of company stock and that their perception of risk "seems more related to the firm's past returns than to its stock volatility").

But ERISA does not require fiduciaries of an EIAP to act as personal investment advisers to plan participants, nor could they do so. They do not have enough information about an employee's other assets, family circumstances, risk tolerance, and so on, to provide such individual advice. Such a plan gives participants the control by design, and it gives employees the responsibility and freedom to choose how to invest their funds.

D.  *Applying the Moench Presumption of Prudence*

We recognize that this logic points in the direction of never recognizing challenges to ESOP fiduciaries' decisions to offer and to continue offering publicly traded employer stock as one of several investment options in an individually directed retirement or other savings plan. We have not gone that far in prior cases, see *Howell*, 633 F.3d at 568-69; *Summers*, 453 F.3d at 411-12; *Steinman*, 352 F.3d at 1106, and we need not go that far

to decide this case. Nevertheless, plaintiffs challenging an ESOP investment offering based on overvaluation — even if they allege circumstances more extreme than those alleged here — will still need to rebut this logic and show a basis for liability that does not depend on hindsight or a theory that plan fiduciaries should have outsmarted an efficient market or used non-public material information for the benefit of plan participants. And plaintiffs challenging an ESOP investment option under the excessive risk theory will need to show extreme risks imposed upon participants by fiduciaries that outweigh the flexibility of a plan that allows employees to select from among a variety of investment options.

We need not explore in this case the outer bounds of what more extreme circumstances might require an ESOP fiduciary to violate plan terms and remove publicly traded employer stock as an investment option. We need not do so because the plaintiffs' allegations here do not come close to describing a circumstance in which no reasonable fiduciary could believe that continuing to offer as one investment option a fund investing primarily in the employer's stock would violate ERISA. Given the clear direction of the Plan documents to offer the fund under any circumstances, "no matter how dire," we do not see how any of the plaintiffs' allegations about M&I's decline would have led the fiduciaries to reasonably think that the adopters of the Plan would have wanted them to remove the M&I Stock Fund as an option under the circumstances alleged here, nor did ERISA require the fiduciaries to violate the terms of the Plan.

First, plaintiffs make no allegations sufficient to indicate that M&I's circumstances were either dire or nearing collapse. The value of employees' investments in M&I dropped in accordance with the rest of the stock market and not so drastically as to be considered dire circumstances. Second, plaintiffs make no allegations sufficient to indicate that, given all the relevant circum-stances, the fiduciaries imposed excessive risk upon the participants. The Plan permitted employees to choose from among twenty-two options and allowed them to change their investments at any time.

To explain the first point, the drop in stock price here was not extraordinary, especially compared to the value of similar banks' stock prices and broader stock market indices during the same period. From November 2006 to April 2010, M&I's stock fell from $46.92 to $21.43 (adjusted to include the Metavante and FIS spin-offs), a drop of 54 percent. As painful as that was, such a drop in stock prices was not unusual for banks during that period. An informal survey of other national and regional banks' stock prices from the same period shows that M&I's stock performance was consistent with the performance of other banks at the time:

| Bank | Starting Stock Price *November 10, 2006* | Ending Stock Price *April 21, 2010* | Percent Drop |
|---|---|---|---|
| M&I | $ 46.92 | $ 21.43 | 54% |
| Bank of America | $ 46.85 | $ 18.05 | 61% |
| Fifth-Third | $ 34.15 | $ 14.40 | 58% |
| Capital One | $ 71.56 | $ 44.18 | 38% |
| Twin Cities Federal | $ 21.65 | $ 15.61 | 28% |

Source: Yahoo! Finance Stock Research Center, finance.yahoo.com

The drop in M&I's stock price was also generally consistent with the overall performance of the market at the time, although M&I's recovery was somewhat slower and more modest than the rest of the market's. M&I's stock fell through 2007 and 2008, hit its lowest point in the first quarter of 2009, and then began to recover. Similarly, the Standard & Poor's 500 index dropped nearly 50 percent in the same period and, like M&I, hit its lowest point in March 2009 and then began to recover. See Yahoo! Finance Stock Research Center, Historical Stock Prices, finance.yahoo.com. Thus, M&I's stock was not performing dramatically worse than other individual stocks or the larger market itself. If at some time during the downward slide the fiduciaries had removed the M&I Stock Fund from the available options in the Plan, the efficient market hypothesis tells us that they would have had difficulty replacing it with a stock or fund that was likely to perform much better.

The 54 percent drop in M&I's stock is also not significantly worse than drops in stock prices in cases where

we and other courts have found, as a matter of law, no violation of the duty of prudence. In *Summers*, we affirmed summary judgment for plan fiduciaries, finding that they did not act imprudently by not divesting from an ESOP despite a total price drop of 84 percent. At each point in the downward slide, the market price was the best estimate of the stock's value, using the efficient market hypothesis for publicly traded stocks. *Summers*, 453 F.3d at 408. In *Howell*, we affirmed summary judgment for fiduciaries of an EIAP, finding they did not act imprudently when they did not remove the employer's stock from the investment options despite a 50 percent drop in the price of the company's stock, which included a slight recovery after dropping 23 percent in one day. That volatility was within the "bounds described by plan documents," and collapse was not imminent. *Howell*, 633 F.3d at 568-69.

In *Citigroup*, the Second Circuit affirmed dismissal of a prudence claim, finding that plan fiduciaries did not act imprudently despite a 52 percent drop in stock price in one year, noting that a 50 percent drop did not compel the fiduciaries to change their course of action. *Citigroup*, 662 F.3d at 141. Similarly, the 54 percent drop here does not amount to the kind of dire or extraordinary circumstance that would have permitted the fiduciaries to disregard the terms of the Plan, let alone required them to do so.

Second, the flexibility of the M&I Plan meant that continuing to offer the M&I Stock Fund did not impose an undue risk on participants. At all times, participants

could choose among twenty-two funds and could transfer money between funds at any time. If employees wanted to avoid the risk of holding or buying more M&I stock, it was easy for them to change investments at any time. (The default choice for employee investments was a diversified "balanced growth" fund. Supp. App. 5.) See *Summers*, 453 F.3d at 410 (noting tension between employee interests and goal of ESOP "is not acute if the participants in the ESOP have adequate sources of income or wealth that are not correlated with the risk of [employer] stock, so that the ESOP is not their primary financial asset").

The availability of other options does not necessarily excuse offering one imprudent investment. ERISA imposes a duty of prudence with regard to every offering, see *Howell*, 633 F.3d at 567, and one can imagine wildly speculative and unsuitable investments. When fiduciaries are considering specific alternatives, though, including whether to remove the employer's stock from the available options, the availability of other options is a relevant factor, especially where employees may face a wide range of financial circumstances. As we explained in *Steinman* and *Summers*, the analysis of a fiduciary's prudence depends on all the relevant circumstances. See *Steinman*, 352 F.3d at 1106 (analyzing a variety of relevant factors to determine whether "taken as a whole the plaintiffs' retirement assets are adequately diversified"); *Summers*, 453 F.3d at 411 (noting source of duty for fiduciaries is excessive risk, and "[h]ow excessive would depend in the first instance on the amount and character of the employees' other assets").

Even if the availability of other options does not itself always excuse a decision to continue offering employer stock, their availability is relevant to how much risk a fiduciary imposes on participants. Participants are not hostage to a company's declining stock if they can invest in other funds. See *Howell*, 633 F.3d at 569 ("The very existence of the three other investment options . . . or eight other options . . . in the absence of any challenge to any of those other funds, offers assurance that the Plan was adequately diversified and no participant's retirement portfolio could be held hostage to Motorola's fortunes"). Mitigating risk further, participants here were limited to investing only 30 percent of their total contributions to the M&I Stock Fund, though they could later move additional assets to M&I stock upon request. This was not a situation in which fiduciaries imposed excessive risk upon participants by not re-moving the M&I Stock Fund.

We do not hold that it is impossible to allege a viable imprudence claim against ESOP fiduciaries or that near demise or excessive risk are the only circumstances under which a fiduciary will be obligated to abandon a plan's directions, though for reasons set forth above, it will be difficult for a plaintiff to meet that standard. For now, suffice it to say that the facts alleged here simply do not indicate that it could have been impru-dent for the M&I fiduciaries to follow the Plan's direc-tions to keep M&I stock as an investment choice.

We also recognize, as the district court did, that the strong language in this Plan's documents requiring

that fiduciaries offer M&I stock, "no matter how dire" the circumstances, may seem to insulate M&I from claims of imprudence in any circumstances. Because the circumstances here — a 54 percent drop in stock price — would not permit plaintiffs to overcome the presumption of prudence regardless of the strength of the Plan's direction to offer M&I stock, we do not rest our decision on that language in light of the fact that ERISA's duty of prudence requires fiduciaries to follow plan documents only insofar as they are "consistent" with ERISA. See 29 U.S.C. § 1104(a)(1)(D). We can leave that more difficult question for another day when fiduciaries faced more extreme circumstances.

On a final note, we recognize that our decision interprets ERISA in a way that gives plan participants a great deal of responsibility for their own investment decisions when the plan allows them to make those decisions. The law in general, including ERISA in this instance, tends to assume that ESOPs operate in a world with rational actors who benefit from free choice and good information. See, *e.g.*, 29 U.S.C. § 1104(c) (safe harbor for fiduciaries where plan participants control investment of assets); Pension Protection Act of 2006, Pub. L. No. 109-280, § 901 (requiring defined contribution plans that invest in employer stock to give employees greater freedom to divest employer stock).

The empirical data tell a different story. In recent surveys, over half of 401(k) participants believed incorrectly that their employer stock funds were less risky than a diversified stock or money market fund. See

Richard Thaler & Cass R. Sunstein, *Nudge* 128 (revised ed. 2009), citing Boston Research Group, *Enron Has Little Effect on 401(k) Participants' View of Company Stock* (2002); Shlomo Benartzi *et al.*, *The Law and Economics of Company Stock in 401(k) Plans*, 50 J.L. & Econ. 45, 53-54 (2007) (reviewing past research and conducting new research on the point); see also Lisa Meulbroek, *Company Stock in Pension Plans: How Costly Is It?*, 48 J.L. & Econ. 443, 447-48 (2005) (summarizing research showing that employees tend to be naive and passive investors and do not understand risk and need for diversity in 401(k) plan investments).

Because of such misunderstandings, employee-directed retirement savings plans can pose substantial risks. Employees may unwittingly take on more risk than is suitable for their purposes. That is not the sort of claim these plaintiffs have brought, though, and this kind of litigation does not seem to be an effective solution to the problem of poorly informed plan participants. Perhaps that problem would be better solved through rules such as limits on employee investments in employer stock, or by encouraging or even requiring plans to offer more education about investing. See, *e.g.*, Benartzi, *et al.*, 50 J.L. & Econ. at 65-69 (suggesting possible policy corrections); Jeff Schwartz, *Rethinking 401(k)s*, 49 Harv. J. on Legis. 53 (2012) (proposing dramatic restructuring of 401(k) plans). But in the absence of other wrongful conduct not alleged here, permitting employees to hold fiduciaries liable for offering employer stock as one option in an individually-directed retirement savings plans would risk converting

the fiduciaries into guarantors of employee retirement savings. That is far beyond what can be expected of fiduciaries of defined contribution plans.

III. *Conclusion*

The plaintiffs' allegations do not state a viable claim for breach of ERISA's fiduciary duty of prudence during the proposed class period. The M&I fiduciaries did not violate ERISA by complying with the terms of the Plan by continuing to offer the M&I Stock Fund as an investment option during M&I's 54 percent decline in stock price, a decline that was not extraordinary but was instead consistent with the rest of the stock market. Offering the fund did not expose the partici-pants to excessive risk, given the flexibility that the Plan gave participants to direct their own investments among a variety of investment options. The judgment of the district court is AFFIRMED.