*In re Lehman Bros. ERISA Litig.*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: March 14, 2013    Decided: July 15, 2013)

Docket No. 11-4232-cv

ALEX E. RINEHART, JO ANNE BUZZO, MARIA DESOUSA,
LINDA DEMIZIO, MONIQUE FONG MILLER,

*Plaintiffs-Appellants*,

-v.-

JOHN F. AKERS, MICHAEL L. AINSLIE, THOMAS H. CRUIKSHANK,
MARSHA EVANS JOHNSON, CHRISTOPHER GENT, ROLAND A. HERNANDEZ,
HENRY KAUFMAN, JOHN D. MACOMBER, MARY PAT ARCHER,
AMITABH ARORA, MICHAEL BRANCA, EVELYNE ESTEY,
ADAM FEINSTEIN, DAVID ROMHILT, ROGER S. BERLIND,
JERRY A. GRUNDHOFER, RICHARD S. FULD, JR., WENDY M. UVINO,

*Defendants-Appellees.**\*

Before:
SACK, WESLEY, *Circuit Judges,* NATHAN, *District Judge.***\*\*

---

\* The Clerk of Court is directed to amend the official caption to conform to the listing of the parties stated above.

\*\* The Honorable Alison J. Nathan, of the United States District Court for the Southern District of New York, sitting by designation.

Plaintiffs-Appellants, former employees of Lehman Brothers Holdings, Inc. ("Lehman"), initiated this action under the Employee Retirement Income Security Act ("ERISA") in the United States District Court for the Southern District of New York (Kaplan, *J.*). They claimed that Defendants-Appellees who were members of Lehman's Employee Benefit Plans Committee breached their fiduciary duty to prudently manage the company's employee stock ownership plan ("ESOP") by failing to "eliminate or curtail" Plaintiffs' investment in Lehman stock during the class period. Plaintiffs also claimed that these Defendants breached their fiduciary duty of disclosure, and that Defendants who were members of Lehman's Board of Directors breached their fiduciary duties to appoint, monitor and inform the plan managers. The district court dismissed Plaintiffs' complaint(s) pursuant to Rule 12(b)(6) because Plaintiffs did not allege sufficient facts to show that members of the Employee Benefit Plans Committee knew or should have known that continued investment in Lehman stock was imprudent. The district court dismissed Plaintiffs' claims against the former Directors as derivative of Plaintiffs' failed claims against the ERISA plan managers. We **AFFIRM**.

AFFIRMED.

---

MARK C. RIFKIN, Wolf Haldenstein Adler Freeman & Herz LLP (Daniel W. Krasner, Gregory M. Nespole, Matthew M. Guiney, Beth A. Landes, Maja Lukic, Wolf Haldenstein Adler Freeman & Herz LLP, New York, NY; Thomas J. McKenna, Gainey & McKenna, New York, NY, *on the brief*), *Interim Co-Lead Counsel for Plaintiffs-Appellant*s.

JONATHAN K. YOUNGWOOD (Janet Gochman, Hiral D. Mehta, *on the brief*), Simpson Thacher & Bartlett LLP, New York, NY, *for the Benefit Committee Defendants-Appellees*.

ADAM J. WASSERMAN (Andrew J. Levander, Kathleen N. Massey, Dechert LLP, New York, NY; Thomas K. Johnson II, J. Ian Downes, Dechert LLP, Philadelphia, PA, *on the brief*), *for all of the Director Defendants-Appellees Other than Richard S. Fuld, Jr.*

Patricia M. Hynes, Todd S. Fishman, Allen & Overy LLP, New York, NY, *for Defendant-Appellee Richard S. Fuld, Jr.*

BENJAMIN R. BOTTS, Attorney (M. Patricia Smith, Solicitor of Labor, Timothy D. Hauser, Associate Solicitor for Plan Benefits Security, Elizabeth Hopkins, Counsel for Appellate and Special Litigation, *on the brief*), United States Department of Labor, Washington, DC, *for Amicus Curiae Hilda L. Solis, Secretary of the United States Department of Labor.*

---

WESLEY, *Circuit Judge*:

Plaintiffs-Appellants ("Plaintiffs") are former employees of Lehman Brothers Holdings Inc. ("Lehman"), or its subsidiaries, who participated in the Lehman Brothers Savings Plan (the "Plan") and, specifically, in the Lehman Stock Fund (the "LSF"). The Plan is covered by the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"). Under the Plan, employees of Lehman could choose to contribute portions of their salaries to different

3

investment funds to save for retirement.  One of the funds, the LSF, is an employee stock ownership plan ("ESOP") invested exclusively in Lehman common stock.  Though the Plan prohibited employees from allocating all of their contributions to the LSF, after Lehman declared bankruptcy in September 2008, that portion of Plaintiffs' retirement savings invested in the LSF was rendered essentially worthless.

Arguing that Defendants-Appellees, the members of Lehman's Employee Benefit Plans Committee (the "Benefit Committee Defendants") and the company's Directors (the "Director Defendants") who appointed them, breached their fiduciary duties under ERISA, Plaintiffs instituted this action in the United States District Court for the Southern District of New York in October 2008.  The district court (Kaplan, *J.*) dismissed Plaintiffs' initial and amended complaints for failure to state a claim.  We affirm the district court's decisions and hold that Plaintiffs failed to plead a plausible claim that Defendants breached their ERISA fiduciary duties.

**Background**

**I. The Plan**

The Benefit Committee Defendants were responsible for administering Lehman's employee retirement savings plan. Lehman Directors who served as members of the Board's Compensation Committee were directly responsible for appointing individuals to the Benefit Committee, which the full Board endowed with "complete authority and discretion to control and manage the operation and administration of the Plan." Joint App'x 436.

The Plan consisted of a Trust Fund that offered multiple investment funds including the LSF. *Id.* at 433. During the class period, if a Lehman employee failed to designate a fund, the default investment option was a target date mutual fund, not the LSF. SCAC ¶ 243. Plan-participants "were permitted to allocate 20 percent (20%) of their Plan contributions to the" LSF. *Id.* ¶ 80. The Plan specifies that the LSF "shall at all times be invested *exclusively* in Lehman Stock except for such reserve invested in short-term fixed income investments or cash as shall be determined to be necessary or advisable for the purpose of maintaining appropriate liquidity . . . ." Joint App'x 430

5

(emphasis added).  However, the Benefit Committee retained the right to cease offering the LSF, or to divest some or all of the Plan's holdings in the LSF, as necessary to comply with ERISA's fiduciary duties.  Specifically, the Plan provided:

> The [Benefit] Committee shall have the right . . . to eliminate or curtail investments in Lehman Stock . . . if and to the extent that the [Benefit] Committee determines that such action is required in order to comply with the fiduciary duty rules of section 404(a)(1) of ERISA, as modified by section 404(a)(2) of ERISA.

*Id.* at 433.

The Benefit Committee Defendants continued to offer the LSF as an investment option throughout the spring and summer of 2008, when Lehman's stock price fluctuated before falling to less than $4.00 per share on the last trading day before the company declared bankruptcy on September 15, 2008 – 158 years after its founding in 1850.  Two days later, NYSE Regulation, Inc. suspended trading of Lehman stock on the New York Stock Exchange.

**II. Procedural History**

Plaintiffs filed a Consolidated Amended Complaint (the "CAC") on October 27, 2008.  The CAC alleged that the

6

Director Defendants, along with Wendy Uvino, the chair of the Benefit Committee, breached their ERISA fiduciary duties.  Plaintiffs premised this claim on Defendants' failure to limit or divest Plaintiffs' allegedly imprudent investment in the LSF during the class period, which ran from September 13, 2006 through October 27, 2008. Plaintiffs lodged three counts against Defendants: (1) breach of the duties of prudence and loyalty (including disclosure obligations); (2) breach of the duty to avoid conflicts of interest; and (3) breach of the duties to monitor other fiduciaries and to provide them with accurate information (solely against the Director Defendants).

On February 2, 2010, the district court granted Defendants' Federal Rule of Civil Procedure 12(b)(6) motion for failure to state a claim and dismissed the CAC in its entirety. *In re Lehman Bros. Sec. & ERISA Litig.*, 683 F. Supp. 2d 294 (S.D.N.Y. 2010) (*Lehman I*).  The district court subsequently granted Plaintiffs leave to amend; Plaintiffs filed a Second Consolidated Amended Complaint (the "SCAC") on September 22, 2010.

Plaintiffs made three key changes.  First, in addition to Wendy Uvino, Plaintiffs named the rest of the Benefit

7

Committee members as Defendants.  Second, Plaintiffs narrowed the class period to March 16, 2008 through June 10, 2009.  These dates respectively represent the date that Bear Stearns was acquired by JPMorgan Chase (in lieu of total collapse) and the date that the Benefit Committee liquidated shares of Lehman stock in the LSF.  Third, the SCAC included additional facts purporting to show that the Benefit Committee Defendants knew or should have known that Lehman stock was an imprudent investment for Plaintiffs.

The 496-paragraph SCAC provides a thorough recitation of the 2008 financial crisis with a focus on Lehman's ill-fated involvement with mortgage-backed securities. Plaintiffs claim that "by no later than the collapse of Bear Stearns, Defendants knew or should have known that the Plan's heavy investment in [Lehman] Stock was imprudent" because of, *inter alia*: Lehman's alleged leverage ratio of more than 30:1; Lehman's use of questionable accounting tactics (including Repo 105);[3] the extent of Lehman's

---

[3] Ordinary repo transactions involve entering into sale and repurchase agreements to satisfy short-term cash needs.  Repo 105 transactions, however, entail removing the asset collateralizing the loan from the company's balance sheet (as if it has been sold) and then using the cash from the transaction to pay down other existing liabilities.  The result of this transaction is to temporarily reduce a company's net leverage ratio.  Shortly after the quarter ends (and reports are submitted), the company then

potential losses from trading in subprime mortgage-backed derivatives; and Lehman's inadequate reserves to cover its exposure.  SCAC ¶¶ 162-63.

Plaintiffs allege that the Benefit Committee Defendants should have been aware of these risks to Lehman's financial stability as a result of their positions within the company,[4] presentations by an outside investment consulting firm, and the numerous published articles and reports that questioned Lehman's profits and long-term viability during the spring and summer of 2008.  Plaintiffs also claim that a reasonable investigation by the Benefit Committee Defendants would have revealed probative information, including, for example, the frantic but ultimately unsuccessful efforts made by Lehman management, in conjunction with government officials, to seek an outside capital infusion or to arrange a sale of Lehman in the weeks prior to bankruptcy.

---

repays the Repo 105 counter-party and the collateralized assets reappear on the company's balance sheet.  *See generally In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 268-69 (S.D.N.Y. 2011).

[4] For example, Plaintiffs claim that Benefit Committee Defendant Amitabh Arora, who allegedly served as Lehman's Global Head of Rates Strategy during the class period and who had previously been the Chief of Mortgage Research at Morgan Stanley, should have recognized "Lehman's exposure to catastrophic losses," given his "background and expertise in the mortgage industry."  SCAC ¶ 63.

The district court dismissed the SCAC pursuant to Rule 12(b)(6). *In re Lehman Bros. Sec. & ERISA Litig.*, No. 09 MD 02017 (LAK), 2011 WL 4632885 (S.D.N.Y. Oct. 5, 2011) (*Lehman II*). With respect to Plaintiffs' duty of prudence claim, the court determined that the complaint failed to plead sufficient facts to show that the Benefit Committee Defendants knew or should have known that Lehman faced a dire situation when Bear Stearns was sold. *Id.* at *3-5.

The district court also dismissed Plaintiffs' two disclosure claims. *Id.* at *5-6. First, the court found that the Benefit Committee Defendants had no affirmative duty to disclose information about Plan investments – specifically, the status of Lehman's financial condition – in addition to information about the Plan itself. *Id.* at *5-6. Second, while the court recognized that fiduciaries who provided information to plan-participants had an obligation to provide accurate information, it determined that the Benefit Committee Defendants had not breached this duty by incorporating filings made with the Securities and Exchange Commission (the "SEC") into the SPD issued to plan participants on January 1, 2008 because this incorporation occurred outside of the class period. *Id.* at *6. Moreover,

10

the court reasoned that although the incorporation was forward-looking, the Benefit Committee Defendants could not be said to have intentionally connected allegedly misleading, future SEC filings to the SPD. *Id.*

With respect to Plaintiffs' claims against the Director Defendants, the court accepted that the Directors were properly considered fiduciaries, but only insofar as they appointed the members of the Compensation Committee, which in turn appointed the members of the Benefit Committee. *Id.* at *6-7. This meant that Plaintiffs' claim for breach of the duty of prudence (and disclosure) was not properly lodged against the Director Defendants. *Id.* at *7. The court rejected Plaintiffs' claim that the Director Defendants had breached their fiduciary duty to appoint qualified plan managers because it was "unsupported by even the barest factual allegations." *Id.* Finally, the court dismissed Plaintiffs' claim that the Director Defendants breached their fiduciary duty to monitor the Benefit Committee Defendants as derivative of Plaintiffs' unsuccessful claim for breach of the duty of prudence. *Id.* at *8.

11

Plaintiffs argue on appeal that the district court erred by dismissing the CAC and the SCAC under Rule 12(b)(6) because Plaintiffs plausibly alleged that: (1) the Benefit Committee Defendants breached their fiduciary duty of prudence by continuing to offer the LSF as an investment option and by failing to sell Lehman stock invested in the LSF; (2) the Benefit Committee Defendants breached their fiduciary duty of disclosure by incorporating Lehman's allegedly inaccurate SEC filings into SPDs sent to plan-participants; and (3) the Director Defendants breached their fiduciary duties to monitor, appoint and inform the Benefit Committee Defendants in their management of Lehman's ERISA Plan.[5]

---

[5] Plaintiffs do not raise any arguments on appeal challenging the district court's dismissal of Plaintiffs' claims for: (1) all defendants' duty to avoid conflicts of interest; (2) the Benefit Committee Defendants' affirmative duty to disclose information about Lehman's financial condition to plan-participants; (3) the Director Defendants' duty to manage the Plan prudently; and (4) the Director Defendants' duty to disclose information directly to plan-participants. Accordingly, Plaintiffs have waived these claims. *United States v. Babwah*, 972 F.2d 30, 34-35 (2d Cir. 1992).

**Discussion**

"We review *de novo* a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6)." *In re Citigroup ERISA Litig.*, 662 F.3d 128, 135 (2d Cir. 2011). Although "[w]e accept as true the facts alleged in the complaint[s]," *id.*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

**I. Duty of Prudence**

*A. The* Moench *Presumption*

Under ERISA, fiduciaries must discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Ordinarily, ERISA fiduciaries must act prudently "by diversifying the investments of the plan so as to minimize the risk of large losses." *Id.* § 1104(a)(1)(C). The primary purpose of an ESOP, however, is investment in employer securities – and

13

employer securities only.  *See Citigroup*, 662 F.3d at 137. This is facially inconsistent with ERISA's requirement that fiduciaries diversify plan-participants' investments. Although "Congress has encouraged ESOP creation by, for example, exempting ESOPs from ERISA's 'prudence requirement,'" it did so "'[]only to the extent that it requires diversification[].'"  *Id.* (quoting *Moench v. Robertson*, 62 F.3d 553, 568 (3d Cir. 1995)); 29 U.S.C. § 1104(a)(2).  The possibility of a serious conflict is apparent; an ERISA fiduciary of an ESOP can easily become torn between the duties to "protect[] retirement assets and encourag[e] investment in employer stock."  *Citigroup*, 662 F.3d at 138.

In *Moench*, the Third Circuit proposed a means of resolving this potential dilemma: minimal judicial review for challenges to a fiduciary's management of an ESOP.  *See* 62 F.3d at 571.  The Third Circuit reasoned that an ESOP is "simply a trust under which the trustee is directed to invest the assets primarily in the stock of a single company . . . a purpose explicitly approved and encouraged by Congress."  *Id.* at 571.  The court observed that trustees are under a duty to "conform to the terms of the trust,"

14

such that "[i]f the trust requires the fiduciary to invest in a particular stock, the trustee must comply unless compliance would be impossible or illegal." *Id.* (internal quotation marks and alteration omitted). As recently noted by the Seventh Circuit, an ESOP fiduciary abuses its discretion under *Moench* if the fiduciary permits investment in employer stock when the fiduciary "'could not have [believed reasonably] that continued adherence to the ESOP's direction was in keeping with the settlor's expectations of how a prudent trustee would operate.'" *White v. Marshall & Ilsley Corp.*, 714 F.3d 980, 988 (7th Cir. 2013) (Hamilton, *J.*) (quoting *Moench*, 62 F.3d at 571).

We recently adopted the *Moench* presumption in *Citigroup*.[6] 662 F.3d at 138. This Court specifically rejected the argument that the *Moench* presumption should not apply at the pleading stage. *Id.* at 139. Because we view the presumption as a standard of review, rather than an evidentiary presumption, "[w]here plaintiffs do not allege facts sufficient to establish that a plan fiduciary has

---

[6] This Court noted that, at the time, "[t]he Sixth, Fifth, and Ninth Circuits ha[d] all adopted the *Moench* presumption." *Citigroup*, 662 F.3d at 138 (citing *Kuper v. Iovenko*, 66 F.3d 1447 (6th Cir. 1995); *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243 (5th Cir. 2008); and *Quan v. Computer Scis. Corp.*, 623 F.3d 870 (9th Cir. 2010)).

15

abused his discretion, there is no reason not to grant a motion to dismiss." *Id.; cf. Pfeil v. State Street Bank and Trust Co.*, 671 F.3d 585, 592-93 (6th Cir. 2012).

*Citigroup* further endorsed the "'guiding principle'" discussed by the Ninth Circuit in *Quan v. Computer Sciences Corp.*, 623 F.3d 870 (9th Cir. 2010), that "judicial scrutiny should increase with the degree of discretion a plan gives its fiduciaries to invest." *Citigroup*, 662 F.3d at 138 (quoting *Quan*, 623 F.3d at 883). "Thus a fiduciary's failure to divest from company stock is less likely to constitute an abuse of discretion if the plan's terms require – rather than merely permit – investment in company stock." *Id.* Plans that do not give fiduciaries discretion to divest from an ESOP are more heavily shielded from searching judicial review. Accordingly, when an ERISA fiduciary is torn between following the terms of a plan requiring investment in employer stock and the provisions of ERISA requiring prudent management, we will presume that the fiduciary acted prudently unless the plaintiff-participant pleads "facts sufficient to show that [fiduciaries] either knew or should have known that [the employer] was in the sort of dire situation that required them to override Plan

16

terms in order to limit participants' investments in [employer] stock." *Id.* at 141.

*Moench* applies here. Although we had not officially adopted it at the time the district court dismissed either of Plaintiffs' complaints, the court presciently employed this standard of review on both occasions. *See Lehman I*, 683 F. Supp. 2d at 301; *Lehman II*, 2011 WL 4632885, at *3-4. Plaintiffs argue that the *Moench* presumption is inapplicable (or, in the alternative, weak) because the Plan gives the Benefit Committee discretion to "eliminate or curtail" investments in the LSF. Appellants' Br. at 21. Were this the case, Plaintiffs would be correct that the *Moench* presumption should apply in limited form. However, contrary to Plaintiffs' characterization, the Plan here does *not* provide the Benefit Committee with discretion sufficient to undermine the policies requiring application of the *Moench* presumption.

The LSF must "at all times be invested exclusively in Lehman Stock," with the exception of minor cash reserves, Joint App'x 430, and the Trust Fund "*shall* consist of the Lehman Stock Fund," among others, *id.* at 433 (emphasis added). The Plan gives the Benefit Committee the right "to

17

eliminate or curtail investments in Lehman Stock . . . *if and to the extent that* the Committee determines that such action is required in order to comply with the fiduciary duties rules" of Section 404 of ERISA. *Id.* at 433 (emphasis added). This does not equate to "discretion" to divest from the LSF. *See Taveras v. UBS AG*, 708 F.3d 436, at 443-46 (2d Cir. 2013) (distinguishing between plans' differing levels of discretion and finding a plan that offered fiduciaries "a means by which to terminate the company's fund as an investment option if [they] so choose[]" was still covered by *Moench* because plan language mandated offering the company's fund). The Plan here merely states the law: Fiduciaries must comply with the applicable tenets of ERISA. In *Citigroup*, we acknowledged "ERISA's requirement that fiduciaries follow plan terms *only to the extent that they are consistent with ERISA*," thus ensuring that even plans affording zero discretion contain implicit legal limits. *See* 662 F.3d at 139 (emphasis added). The limit here is simply made explicit. The *Moench* presumption applies in full force.

Before applying the *Moench* presumption in this case, we first address two legal questions implicated by its

application.  First, can Plaintiffs claim that the Benefit Committee Defendants knew or should have known that Lehman stock was an imprudent investment based on material, nonpublic information?  Second, how specific must Plaintiffs be with regard to when the Benefit Committee Defendants knew or should have known that Lehman was in a "dire situation"?

### *1. Inside Information*

Many of the facts that Plaintiffs allege gave rise to the Benefit Committee Defendants' awareness (or actionable ignorance) of Lehman's "dire situation," were not public during the class period.  For example, Plaintiffs claim that the Benefit Committee Defendants knew or should have known about private conversations between Lehman's Chief Executive Officer, Defendant Richard S. Fuld, Jr. ("CEO Fuld"), and Treasury Secretary Paulson.

Plaintiffs argue that the Benefit Committee Defendants had a duty to investigate whether Lehman was in a dire situation, and that any reasonable investigation would have revealed material, nonpublic information sufficient to confirm that Lehman was on the verge of collapse.[7]  In its

---

[7] Plaintiffs anticipate that the Benefit Committee Defendants would have discovered material, nonpublic information in part because Plaintiffs claim that the Director Defendants had

amicus brief supporting Plaintiffs, the Secretary of Labor (the "Secretary") asserts that "a reasonable investigation of Lehman's financial health" would have revealed such nonpublic information as Lehman's use of improper accounting methods and private conversations between CEO Fuld and the government about selling Lehman or obtaining a capital infusion. Amicus Br. at 25-26. According to the Secretary, objectively prudent fiduciaries would have uncovered this type of inside information and acted upon it.[8]

Several other Circuits have confronted, and rejected, similar arguments. Recently, in *White*, the Seventh Circuit disposed of any contention that insiders should engage in transactions based on material, nonpublic information, as this "would violate federal securities laws." 714 F.3d at 992. In *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 256 (5th Cir. 2008), the Fifth Circuit confirmed that "[f]iduciaries may not trade for the benefit of plan

---

a duty to provide it to them – a duty that we refuse to find on these facts. *See infra* Part III.

[8] Although the Secretary of Labor's amicus brief implies that the Benefit Committee Defendants should have divested the LSF of Lehman stock, at oral argument, the attorney representing the Department of Labor clarified the Secretary's position as solely that the Benefit Committee Defendants should have ceased purchasing Lehman stock on behalf of participants who elected to put their savings into the LSF during the class period.

participants based on material information to which the general shareholding public has been denied access," and that this served to "reenforce[] . . . the conclusion that the *Moench* presumption cannot be lightly overcome." Likewise, in *Quan*, the Ninth Circuit noted that one reason to adopt the *Moench* presumption is because its high burden "gives fiduciaries a safe harbor from failing to use insider information to divest from employer stock." 623 F.3d at 881. "We do not construe an ERISA fiduciary's duties of loyalty and prudence to include violating the law to serve a plan's beneficiaries." *Id.* at 882 n.8.

Fiduciaries are under no obligation to either seek out[9] or act upon inside information in the course of fulfilling their duties under ERISA. The duty of a fiduciary to prudently discharge his obligations "solely in the interest of the participants and beneficiaries" should be read to end with the words *within the bounds of the law*. 29 U.S.C. § 1104(a)(1)(B). The prudent man does not commit insider trading. We recognize that, had the Benefit Committee Defendants sought inside information that revealed the

---

[9] This is not a case in which fiduciaries in charge of day-to-day plan management already knew material, nonpublic information by virtue of their corporate insider status.

21

imprudence of continued investment in Lehman stock, breaching the terms of the Plan by ceasing to offer the LSF as an investment option would not run afoul of federal securities laws given the absence of a purchase or sale of stock. *See, e.g., Harris v. Amgen, Inc.*, – F.3d –, No. 10-56014, 2013 WL 2397404, at * 14 (9th Cir. June 4, 2013).

Consider, however, that if plan managers are obligated to conduct an investigation into the financial condition of a plan asset that extends to material, nonpublic information, plan managers will face a dilemma if inside information shows that continued investment is imprudent. On the one hand, plan managers will be able to adhere to their duty of prudence by limiting further investment in the improvident asset without breaching securities laws. On the other hand, plan managers will not be able to comply with their duty of prudence by divesting the plan of its pre-existing investment without risking liability for insider trading. There is no happy solution to this quandary, and – particularly when ERISA plans are managed internally – it is a situation that is bound to occur. Given the conflicted state of the law, there seems but one reasonable approach: The duty of prudence must not be construed to include an

22

obligation to affirmatively seek out material, nonpublic information pertaining to plan investments.

*2. Timing*

In *Lehman I,* the district court dismissed Plaintiffs' claim against the Benefit Committee Defendants for breach of the duty of prudence because Plaintiffs failed "to allege facts that permit a determination of when Lehman's financial condition" reached the point of imminent corporate collapse. 683 F. Supp. 2d at 302. Although Plaintiffs specified a moment of clarity in the SCAC – March 16, 2008, the sale date for Bear Stearns – the district court was not persuaded that Plaintiffs had alleged sufficient facts to explain "why those circumstances alerted or ought to have alerted Lehman that it would suffer the same fate" as Bear Stearns. *Lehman II*, 2011 WL 4632885, at *5.

Plaintiffs argue that "[t]he district court's unprecedented requirement that a complaint must specify the precise moment in time when a company faces imminent collapse or other dire circumstances imposes an impossible pleading burden on a plaintiff." Appellants' Br. at 41. While such a requirement might well be unduly onerous, *see Pfeil*, 671 F.3d at 596 n.3, the district court here did not

23

reject Plaintiffs' claims solely because Plaintiffs failed either to allege any specific point in time (in the CAC) or to allege the correct point in time (in the SCAC) when Lehman stock became an imprudent investment. Instead, the court concluded that Plaintiffs did not allege facts sufficient to show that the Benefit Committee Defendants knew or should have known that Lehman was in a dire situation *at any point* within the class period. *See Lehman I*, 683 F. Supp. 2d at 302-03; *Lehman II*, 2011 WL 4632885, at *4-5.

In *Lehman I*, the district court noted that "[e]ven assuming that the CAC sufficiently alleged that Lehman's collapse became imminent at some time materially before the bankruptcy filing, it contains nothing to support the inference that Ms. Uvino [the only Benefit Committee Defendant] . . . knew or should have known that." 683 F. Supp 2d. at 302. In *Lehman II*, the district court considered four allegations that Plaintiffs claimed indicated the Benefit Committee Defendants' necessary knowledge. 2011 WL 4632885, at *3-5. Of these, two involve events that took place *after* Bear Stearns collapsed, thus indicating that the district court was open to considering

24

the sufficiency of Plaintiffs' allegations of imprudence throughout the class period.  *Id*. at *4-5.  Like the district court, we will consider Plaintiffs' allegations regarding what the Benefit Committee Defendants knew or should have known throughout the entire class period.  We do not demand any particular timing specificity – only that the facts alleged, if true, lead to the conclusion that Defendants knew or should have known that the company was in a dire situation at some time during the class period.

### B. Applying the Moench *Presumption*

There is no "bright-line rule" regarding how much evidence is necessary to rebut the *Moench* presumption.  *Quan*, 623 F.3d at 883.  It is clear, however, that the *Moench* presumption is very difficult to overcome – as it is designed to be.  *See id.; see also White*, 714 F.3d at 991-93; *Citigroup*, 662 F.3d at 140-41.  "[P]roof of the employer's impending collapse may not be required," but mere stock fluctuations are insufficient to show that fiduciaries acted imprudently by adhering to the terms of an ESOP.  *Id.* at 140; *see also Kirschbaum*, 526 F.3d at 256 n. 12 (citing cases featuring approximately 75% decreases in stock price that did not include facts sufficient to overcome the *Moench*

presumption).  Whether a fiduciary knew or should have known that the employer was in a "dire situation" is assessed "based upon information available to the fiduciary at the time of each investment decision and not 'from the vantage point of hindsight.'"  *Citigroup*, 662 F.3d at 140 (citing 29 U.S.C. § 1104(a)(1)(B)).

Thus, the fact that Lehman *ultimately* declared bankruptcy must not be allowed to influence our assessment of whether the Benefit Committee Defendants acted prudently during the class period.  Armed with the information available in the months preceding bankruptcy, the Benefit Committee Defendants risked liability for action (violating the terms of the ESOP by limiting Plaintiffs' investment) or inaction (remaining invested and exposing plan-participants to what may have been unintended risk).  *See Summers v. State Street Bank & Trust Co.*, 453 F.3d 404, 410 (7th Cir. 2006).  Had the Benefit Committee Defendants[10] sold Lehman stock immediately after Bear Stearns was sold, for example, plan-participants might have protested and claimed that the fiduciaries erroneously violated the terms of the Plan and

---

[10] The Benefit Committee Defendants are fiduciaries for purposes of Plaintiffs' claims because they had "complete authority and discretion to control and manage the operation and administration of the Plan."  Joint App'x 436.

deprived them of the subsequent increase in the value of Lehman's stock. Although Lehman's share price exhibited a downward trend overall during the spring and summer of 2008, the daily price per share fluctuated widely. Immediately after Bear Stearns was sold, on March 17, 2008, Lehman was trading at $31.75 per share. Six weeks later, on April 28, 2008, Lehman's stock price had risen to $47.52 – an approximately 50% increase.[11]

During the week before Lehman filed for bankruptcy, its stock price fell steadily from $14.15 per share on Monday, September 8, 2008, to $3.65 per share at the close of business on Friday, September 12, 2008. But even then, in Lehman's final hours, the market arguably viewed the 158-year-old company as a going concern by assigning it a positive expected value.[12] "A [fiduciary] is not imprudent

---

[11] As the Seventh Circuit observed in similar circumstances, "[c]ourts can take judicial notice of public stock price quotations without converting a motion to dismiss into one for summary judgment." *White*, 714 F.3d at 985.

[12] We assume for these purposes that markets operate efficiently. Any other assumption is incompatible with developing a workable standard. *See generally White*, 714 F.3d at 992-93; *see also* Ronald J. Gilson & Reinier H. Kraakman, *The Mechanisms of Market Inefficiency*, 70 VA. L. REV. 549 (1984); *but see* Lynn A. Stout, *The Mechanisms of Market Inefficiency: An Introduction to the New Finance*, 28 J. CORP. L. 635 (2003).

Although Plaintiffs did not raise the issue in either the CAC, the SCAC or their briefs on appeal, we note two SEC Orders from July 2008 that had the potential to affect market efficiency

27

to assume that a major stock market . . . provides the best estimate of the value of the stocks traded on it." *Id*. at 408. We realize, of course, that it is not quite that simple. While we do not believe that fiduciaries should be forced to second-guess the market's valuation of an investment, we understand that (although it is empirically impossible to quantify) ERISA plan-participants have interests that are distinct from market investors collectively – namely, greater risk-aversion. Congress, too, recognized this when it enacted ERISA. *See generally* 29 U.S.C. § 1104(a). However, Congress explicitly allows (some have said encourages)[13] fiduciaries to contract around

---

during the class period. *See Emergency Order Pursuant to Section 12(k)(2) of the Securities Exchange Act of 1934 Taking Temporary Action to Respond to Market Developments*, Release No. 58166, July 15, 2008, *available at* http://www.sec.gov/rules/other/2008/34-58166.pdf; *see also Amendment to Emergency Order Pursuant to Section 12(k)(2) of the Securities Exchange Act of 1934 Taking Temporary Action to Respond to Market Developments*, Release No. 58190, July 18, 2008, *available at* http://www.sec.gov/rules/other/2008/34-58190.pdf. In July 2008, in order to "maintain fair and orderly securities markets," the SEC prohibited short selling securities of certain large financial firms, including Lehman. *Id.* Because Plaintiffs did not allege that the Benefit Committee Defendants knew or should have known about the SEC Orders or the potential effect they may have had on the market's valuation of Lehman stock, we do not consider the uncertain impact of this temporary regulation.

[13] "Congress favors ESOPs as a policy matter because they provide a way for employers to align employee and management interests." *White*, 714 F.3d at 986 (citing Tax Reform Act of

28

the basic core of prudent investing: diversification. *Id.* §
1104(a)(2).

Here, Plaintiffs have not rebutted the *Moench*
presumption because they fail to allege facts sufficient to
show that the Benefit Committee Defendants knew or should
have known that Lehman was in a "dire situation" based on
information that was publicly available during the class
period. First, we note that the forced sale of Bear Stearns
alone does not show that Lehman specifically was in serious
danger. In fact, given that Bear Stearns was (effectively)
bailed out by the government,[14] the events of March 16, 2008
could be construed to cut against Plaintiffs' claims because
the Benefit Committee Defendants may have believed that
Lehman would be saved as well.[15] Likewise, the general

1976, Pub. L. No. 94-455, § 803(h), 90 Stat. 1520, 1590 (1976)).
Indeed, to preserve and encourage ESOPs, Congress exempted
fiduciaries of ESOPs from the duty to diversify and accordingly
limited the duty of prudence. 29 U.S.C. § 1104(a)(2).

[14] The government orchestrated Bear Stearns' sale to JPMorgan
Chase by providing JPMorgan Chase with a non-recourse loan
collateralized only by Bear Stearns' assets, thus, in effect,
bailing out Bear Stearns.

[15] Although the SCAC alleges that in or around July 2008,
"the government announced that it would not bail out other
failing financial institutions," SCAC ¶ 337, it also claims that
on September 11, 2008, Lehman's CEO, "Defendant Fuld[,] was asked
to resign from the board of the New York Federal Reserve, to
avoid the appearance of impropriety in case the government was
required to front any money to find Lehman a strategic partner,"

29

climate for financial firms in 2008, the collective information known (or knowable) to the Benefit Committee Defendants by virtue of their positions at Lehman, the investment consulting firm's presentations, public articles and reports, Lehman's financial disclosures and Lehman's declining (but still positive) stock price do not counter the presumption that these fiduciaries acted prudently by remaining invested in Lehman stock.

Plaintiffs claim that the Benefit Committee Defendants should have been aware of Lehman's alleged high leverage ratio, its broad exposure to the subprime mortgage market, its inability to cover the extent of its potential losses and its use of questionable accounting tactics (such as Repo 105) by virtue of their expertise and their positions at Lehman. We agree with the district court that Plaintiffs' allegations are "conclusory," *Lehman II*, 2011 WL 4632885, at *3, and that, regardless, they merely show that the members of the Benefit Committee would have possessed comparable

---

*id.* ¶ 382.  However, Plaintiffs also allege that on September 12, 2008, the last trading day before Lehman declared bankrupcy, Treasury Secretary Paulson leaked to the media that the government would not aid Lehman's survival.  *Id.* ¶ 389.  Based on the SCAC, the government was not Lehman's last hope, however, as both CEO Fuld and representatives of the Federal Reserve continued their efforts to negotiate a sale of Lehman over the weekend of September 13-14, 2008.  *Id.* ¶¶ 391-92, 395-96.

knowledge to the market analysts and investors who helped maintain Lehman's substantial market capital even immediately prior to the company's bankruptcy.

Plaintiffs further allege that the Benefit Committee Defendants knew or should have known that Lehman was an imprudent investment because of presentations by an outside consulting firm showing that the subprime mortgage market was on the verge of collapse. The presentations to the Benefit Committee Defendants, however, did not deal specifically with the potential effects of a credit crunch on Lehman. The majority of the investment consulting firm's analyses focused on comparing the degree of Lehman's downward spiral with the market-wide decline. Based on Plaintiffs' allegations, which we accept as true, the Benefit Committee Defendants were not obligated, after allegedly being told that Lehman was under-performing the market, to breach the terms of the Plan by refusing to offer the LSF or by divesting Lehman stock.

Plaintiffs argue that several published articles and reports questioning Lehman's viability should have alerted the Benefit Committee Defendants to Lehman's imprudence as an investment. Even accepting the truth of Plaintiffs'

31

allegations, these types of statements in the financial press do not give rise to a plausible assertion that the Benefit Committee Defendants knew or should have known that Lehman was in a "dire situation." We agree with Plaintiffs that Lehman's increasingly frequent write-downs of losses (and the media coverage thereof) should have given rise to concern. However, we still cannot find that Plaintiffs plausibly alleged that the Benefit Committee Defendants knew or should have known that Lehman was an imprudent investment given the mixed signals with which the fiduciaries grappled throughout the class period. For example, Plaintiffs allege in the SCAC that Lehman "materially overstated its liquidity pool" when it "publicly announced that it[ ] was $41 billion" on September 10, 2008, just days before the company filed for bankruptcy. SCAC ¶ 367. It seems that Plaintiffs' claims are improperly directed; the true objects of Plaintiffs' ire are the Lehman executives whom Plaintiffs allege made material misstatements regarding the financial health of the company – not the ERISA fiduciaries who relied on them.

Still, Plaintiffs claim that even if these indicators could not, standing alone, compel the Benefit Committee

Defendants to "curtail or eliminate" the LSF, the facts alleged should have incited these fiduciaries to conduct an investigation that would have revealed the imprudence of maintaining the investment in the LSF.  But Plaintiffs recognize that a failure to investigate, on its own, is insufficient to state a claim for breach of the duty of prudence, and that "plaintiffs must allege facts that, if proved, would show that an 'adequate investigation *would have revealed* to a reasonable fiduciary that the investment at issue was improvident.'"  *Citigroup*, 662 F.3d at 141 (citing *Kuper v. Iovenko*, 66 F.3d 1447, 1460 (6th Cir. 1995)) (emphasis added).  Here, any reasonable investigation undertaken by the Benefit Committee Defendants would not have revealed additional facts sufficient to compel the fiduciaries to break the terms of the Plan because they could not have based "prudent" investment choices on the material, nonpublic information that Plaintiffs claim showed that Lehman was failing.

We find that the sum of Plaintiffs' plausible allegations do not overcome the *Moench* presumption.  Market fluctuations and an above-water price immediately in advance of bankruptcy would not have put a prudent investor on

33

notice that Lehman had reached a "dire situation."  We understand that the risk-tolerance of participants in an ESOP may differ from the risk-tolerance of the market as a whole, but single-stock portfolios are *inherently* risky.[16] We cannot penalize fiduciaries who allow plan-participants to invest in Congressionally-encouraged ESOPs absent very strong indications that fiduciaries knew or should have known that participants no longer desired to remain invested.[17]

---

[16] Curiously, research indicates that this is not the public's perception.  *See White*, 714 F.3d at 993-94.  However, "[t]here is no doubt that it is highly risky for an individual employee to invest heavily in the employer's stock."  *Id.* (citing numerous expert sources for proposition that single-stock investments are exposed to greater risk than diversified portfolios).

[17] Plaintiffs' reliance on several out-of-Circuit district court cases is misplaced.  *See* Appellants' Br. at 31-34.  The facts alleged in *In re YRC Worldwide, Inc. Erisa Litigation*, No. 09-2593-JWL, 2010 WL 4386903 (D.Kan. 2010), for example, are arguably more severe than those pled here; the district court found the *Moench* presumption rebutted on the basis of, *inter alia*, the company's debt-for-equity exchange program that diluted the value of existing shareholders' shares by 95% by creating one billion new shares.  *Id.* at *6-7.  Two of Plaintiffs' cases did not involve ERISA plans that *required* the availability of a company stock fund.  *See Dann v. Lincoln Nat. Corp.*, 708 F. Supp. 2d 481, 489-90 (E.D.Pa. 2010) (applying the "intermediate abuse of discretion standard as defined in *Moench*" but on the basis of plans that merely "contemplate and expect that the [company] Common Stock Fund is available as an investment option"); *Carr v. Int'l Game Tech.*, 770 F. Supp. 2d 1080, 1094 (D.Nev. 2011) (finding that "Committee members were fiduciaries with the discretion to remove [company] stock from the menu of investment options" and that, even with the lower threshold, plaintiffs failed to rebut the *Moench* presumption).

## II. Duty of Disclosure

Plaintiffs also claim that the Benefit Committee Defendants breached their duties of disclosure under ERISA by incorporating Lehman's allegedly inaccurate SEC filings into SPDs sent to plan-participants. According to Plaintiffs, assessing the viability of their claim requires answering three questions: (1) whether the Benefit Committee Defendants were acting as fiduciaries when they incorporated the SEC filings; (2) whether the SPDs were sent to plan-participants during the class period; and (3) whether the Benefit Committee Defendants knew these SEC filings contained misleading information, and, if not, whether they had an obligation to investigate the possibility based on "'warning' signs." Appellants' Br. at 56.

Using Plaintiffs' proposed framework, first, liability under ERISA can "arise[] only from actions taken or duties breached in the performance of ERISA obligations." *In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 760 (S.D.N.Y. 2003) (finding that SPD incorporation of SEC filings was "insufficient to transform those documents into a basis for ERISA claims against their signatories" – the directors). In its recent decision in *Dudenhoefer v. Fifth Third*

35

*Bancorp.*, 692 F.3d 410, 422-23 (6th Cir. 2012), the Sixth Circuit addressed the previously unanswered "question of whether the express incorporation of SEC filings into an ERISA-mandated SPD is a fiduciary communication." The court answered this question in the affirmative because "selecting the information to convey through the SPD is a fiduciary activity." *Id.* at 423. We agree. The Benefit Committee Defendants in this case were acting as ERISA fiduciaries when they incorporated Lehman's SEC filings into the SPD distributed to plan-participants.

Second, Plaintiffs argue that the district court erred because, although the SEC filings were prepared before the class period began, the SPDs were sent to plan-participants during the class period. The SPDs of concern here were issued on January 1, 2008; the class period began on March 16, 2008, as specified by the SCAC. Plaintiffs' argument depends on their claim that the SPDs were "*sent* to Plan participants during the Class Period," but Plaintiffs do not plausibly allege this fact. Appellants' Br. at 56 (emphasis added). Still, as the district court recognized, "the incorporation was forward-looking inasmuch as the SPD purported to incorporate future SEC filings." *Lehman II*,

36

2011 WL 4632885, at *6. However, Plaintiffs must still articulate a viable claim that the Benefit Committee Defendants knew of false statements contained in (or yet to be contained in) the SEC filings incorporated in (or yet to be incorporated in) the SPDs.

Thus, third, "a fiduciary may be held liable for false or misleading statements when 'the fiduciary knows those statements are false or lack a reasonable basis in fact.'" *Gearren v. The McGraw-Hill Cos., Inc.*, 660 F.3d 605, 611 (2d Cir. 2011) (quoting *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 84 (2d Cir. 2001)). Here, Plaintiffs have not identified any specific portions of Lehman's SEC filings that the Benefit Committee Defendants knew were false or misleading – or that even *are* false or misleading.[18]

Plaintiffs also argue that the Benefit Committee Defendants had a duty to investigate the veracity of Lehman's SEC filings before incorporating them into the SPD

---

[18] Plaintiffs do assert that "Lehman's accounting treatment for its Repo 105 transactions, and the total absence of any disclosure about Repo 105 in . . . SEC filings . . . created a false impression of Lehman's business condition, violating [Generally Accepted Accounting Principles]." SCAC ¶ 195. Plaintiffs, do not, however, plead facts to show that the Benefit Committee Defendants knew about Repo 105 or its allegedly misleading omission from SEC filings incorporated into the SPD.

37

because they were "undoubtedly privy to multiple 'warning' signs" that these corporate documents were materially misleading. Appellants' Br. at 56-57. In *Citigroup*, we held that Plaintiffs must "allege[] facts that, without the benefit of hindsight" show that an investigation of the accuracy of a company's SEC filings was warranted. 662 F.3d at 145. This Court observed that

> requiring Plan fiduciaries to perform an independent investigation of SEC filings would increase the already-substantial burden borne by ERISA fiduciaries and would arguably contravene Congress's intent 'to create a system that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place.'

*Id.* (quoting *Conkright v. Frommert*, 130 S.Ct. 1640, 1649 (2010)) (alterations in original).

Here, the publicly-known information available to the Benefit Committee Defendants did not give rise to an independent duty to investigate Lehman's SEC filings prior to incorporating their content into SPDs issued to plan-participants.

**III. Duties to Appoint, Monitor and Inform**

Plaintiffs also appeal from the district court's dismissal of several related claims lodged against the

38

Director Defendants. Specifically, Plaintiffs argue that the Director Defendants, acting in a fiduciary capacity, breached their duties under ERISA in four ways: (1) failing to appoint qualified plan managers; (2) failing to replace the Benefit Committee Defendants; (3) failing to monitor the Benefit Committee Defendants; and (4) failing to provide the Benefit Committee Defendants with "crucial information about Lehman's dire situation." Appellants' Br. at 48-49.

Initially, the Director Defendants contend that not all of them are ERISA fiduciaries for purposes of Plaintiffs' claims because only the members of the Compensation Committee were responsible for appointing and monitoring plan managers.[19] Because we agree with the Director Defendants' argument that the district court properly dismissed Plaintiffs' claims as either inadequately pled or derivative of the failed prudence claim, we decline to reach the question of which particular Directors qualified as ERISA fiduciaries.

---

[19] ERISA authorizes fiduciaries to allocate their responsibilities to other named fiduciaries pursuant to a plan's express provisions. 29 U.S.C. § 1105(c). However, the allocating fiduciaries may still be liable if their decision to delegate their responsibilities breached ERISA's duty of prudence under Section 404(a)(1). *Id.* § 1105(c)(2)(A).

First, we affirm the district court's dismissal of Plaintiffs' duty to appoint and duty to replace claims as conclusory and unsupported.  Second, we affirm the court's dismissal of Plaintiffs' duty to monitor claim as derivative of Plaintiffs' failed duty of prudence claim.  Plaintiffs cannot maintain a claim for breach of the duty to monitor by the Director Defendants absent an underlying breach of the duties imposed under ERISA by the Benefit Committee Defendants.

Third, we find that the district court also correctly dismissed Plaintiffs' claim for breach of the duty to inform as derivative of Plaintiffs' claims against the Benefit Committee Defendants.  But, even if we determined that Plaintiffs adequately alleged that the Benefit Committee Defendants had violated their duty of prudence, we would be unlikely to conclude that the Director Defendants had a duty to keep the plan managers apprised of material, nonpublic information regarding the soundness of Lehman as an investment.  We have already declined to "create a duty to provide participants with nonpublic information pertaining to specific investment options."  *Citigroup*, 662 F.3d at 143; *see also Lanfear v. Home Depot, Inc.*, 679 F.3d 1267,

40

1284-86 (11th Cir. 2012). Since ERISA fiduciaries have no duty to disclose inside information to plan-participants so that participants may act on it, Plaintiffs' argument that the Benefit Committee Defendants should have been privy to inside information so that *they* could act on it on behalf of plan-participants is simply not persuasive.

## Conclusion

Lehman's demise was doubtless attributable to a number of identifiable causes that become apparent through the lens of hindsight. We conclude, however, that Plaintiffs have not adequately pled that Lehman was in a dire situation that the Plan fiduciaries could or should have recognized during the class period. ERISA puts those fiduciaries in an unfortunately difficult position – on the proverbial "razor's edge," *White*, 714 F.3d at 990 – in attempting to meet their fiduciary duty of prudence while simultaneously offering an undiversified investment option to employees trying to save for retirement. Plaintiffs have not adequately alleged that Defendants fell off of that edge.

For the foregoing reasons, the orders of the district court are hereby **AFFIRMED**.

41